Rosalie HENDERSON and Joe N. Poole, as Executors of the Will of Jessie Poole, Deceased, Appellants,

v.

Arthur S. FLEMMING, Secretary of Health, Education and Welfare, Appellee.

No. 18386.

United States Court of Appeals Fifth Circuit.

Nov. 23, 1960.

Calvin Poole, Greenville, Ala., for appellants.

Albert E. Byrne, Asst. U. S. Atty., Hartwell Davis, U. S. Atty., Montgomery, Ala., for appellee.

Before RIVES, Chief Judge, and BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The question we have to determine is the one which the Secretary through the decision of the Appeals Council posed:

"Actually, the simple issue as it was aptly stated * * * to the Appeals Council * * * is whether, in order to qualify for social security benefits, this claimant [Mrs. Poole] had to *personally* supervise her farming operations, or whether such operations could be carried on through

884

agents or employees." [1] (Emphasis in original.)

Before us the Secretary perhaps seeks to escape from this delineation by suggesting that more properly the question is whether on the record as a whole the fact findings (including inferences) are sustained by substantial evidence. This is, of course, the test prescribed by § 205(g), 42 U.S.C.A. § 405(g); Boyd v. Folsom, 3 Cir., 1958, 257 F.2d 778, 781; Carqueville v. Flemming, 7 Cir., 1959, 263 F.2d 875, 877; Hobby v. Burke, 5 Cir., 1956, 227 F.2d 932. But running through that whole concept as a principal thread is the idea that the fact findings are acceptable only where it is evident that the correct legal standard has been employed by the trier of the fact. Cf. Galena Oaks Corp. v. Scofield, 5 Cir., 1954, 218 F.2d 217; Mitchell v. Raines, 5 Cir., 1956, 238 F.2d 186; United States v. Williamson, 5 Cir., 1958, 255 F.2d 512, 515.

Our answer to that query is contrary to that of the Secretary. We conclude that what was done constituted "material participation by the owner [of a farm] * * * in the production or the management of the production of" an agricultural commodity. In reaching that conclusion we do not reject any evidence credited by the Secretary or credit any that the Administrator rejected. Indeed, we regard the evidence both on the underlying factual details as well as the critical statutory inferences to be undisputed.

The playback approach, this time on legislative development is again helpful. Mitchell v. Hooper Equipment Co., Inc. et al., 5 Cir., 1960, 279 F.2d 893. In 1950 self-employed persons were first brought under the Old Age and Survivors Insurance Program. Prior to the 1954 Amendments, it was established that all self-employed farmers were excluded from coverage under the Act. This exclusion was accomplished by excepting from "net earnings from self-employment" such income derived by a self-employed individual from a business which if carried on by employees would constitute agricultural labor. In the 1954 Amendments, self-employed farm operators were brought under the Act by deleting the exception from net earnings from self-employment relative to agricultural labor. Congress was careful, however, to continue to exclude as self-employment income any amounts received as "rentals from real estate and from personal property leased with the real estate" whether such rental was paid in cash or as a share in crops.[2] In 1956 it was again amended to broaden coverage to include farm owners or farm tenants if there was a "material participation by the owner or tenant in the production or the management of the production of * * * agricultural * * * commodities * * *." [3]

---

1. This was but an echoing paraphrase of the Referee's decision:

"More specifically, the issue in this case * * * might be refined further by being stated as:

" 'Can a person "materially participate" within the meaning of the 1956 Amendments in respect to obtaining "net earnings from self-employment" while acting entirely through an agent under a sharecropping arrangment; provided, the claimant does assume some financial risks and some participation of a limited nature in the making of personal management decisions?' "

2. "(1) There shall be excluded rentals from real estate and from personal property leased with the real estate (including such rentals paid in crop shares), together with the deductions attributable thereto, unless such rentals are received in the course of a trade or business as a real estate dealer * * *." 42 U.S. C.A. § 411(a) (1) (1957). There was a parallel provision in the Internal Revenue Code, 26 U.S.C.A. § 1402(a) (1) (1955) (1954 Code).

3. As a result of the amendment, § 411(a) (1) as well as 26 U.S.C.A. § 1402(a) (1), read:

"(a) The term 'net earnings from self-employment' means the gross income, as computed under chapter 1 of Title 26, derived by an individual from any trade or business carried on by such individual * * *; except that in computing such gross income and deductions * * *—

"(1) There shall be excluded rentals from real estate and from personal property leased with the real estate (including such rentals paid in crop shares), together with the deductions attributable

It was, to be sure, stated somewhat awkwardly by an exception to an exclusion. But we regard this as of no moment and treat it as another instance of Congressional English, Commissioner of Internal Revenue v. Acker, 1959, 361 U.S. 87, 95, 80 S.Ct. 144, 4 L.Ed.2d 127 (dissent), as Congress weaves and rips the Penelopean tax garment, United States v. Bond, 5 Cir., 1958, 258 F.2d 577, 584, to meet the undulating underlying changes in legislative policy.

The social security benefits were sought by Mrs. Jessie Poole then 91 years of age and who unfortunately did not survive the administrative determination of her eligibility to governmental benefits which came into statutory being during her 90th year. She must have witnessed many changes from 1867, including those on a cotton plantation. But the record leaves one with the definite conviction that for many, many years cotton farming on her farm went along the same. Nothing changed in 1956–1957 on the farm, or in what she did, or what her son, Joe Poole, did. What changed was the law. The question then is whether what she did those years (and had been doing for many more) was the sort of farm operation Congress had in mind as it broadened coverage by excepting the exclusion, see note 3, supra.

In 1907 Mrs. Poole's husband died leaving her with four children and a life interest in an 1100-acre plantation of which some 600 were suited for cultivation. Since about 1912 her son, Joe, has farmed 400 of these acres for his own account. The rental value under current conditions would be approximately $2500 per year. The remaining 200 acres have been farmed for Mrs. Poole's account. Prob-

ably during most of this time, and certainly in the years 1956–1957 and just previously, all of the management from an owner's standpoint has been by Joe. Mrs. Poole was an invalid and physically unable to oversee farming operations from her wheelchair. Joe has considered that the rent-free use of the 400 acres was more than ample consideration for the management of his mother's operations. Each operation was kept distinct and separate and at no time was there any partnership.

The 200 acres were actually farmed by sharecropping tenants selected by her son, Joe, who thereafter made all significant operating decisions. After a prefatory statement that "the evidence shows that for more than 40 years her farm was actually operated and managed by her son as her agent" the Appeals Council summarized his activities this way. "The evidence shows that *he* selected the land the sharecroppers were to work, that *he* decided when the land was to be planted, how much fertilizer was to be used, when the crops were to be cultivated, when the plants were to be sprayed, when the crops were to be harvested and when they were to be sold."

Under the sharecropping arrangements effected in her behalf by Joe, Mrs. Poole, of course, furnished the land. But there was much more. She was required to bear a considerable financial risk and contribution. She furnished the planting seed and bore one-half the cost of insecticide which ran in the neighborhood of $1100 per year. She was required to "break ground" and plant the crop. This was done for her by her son, Joe, on a contract basis, the charges being based upon the out-of-pocket labor and fuel ex-

thereto, unless such rentals are received in the course of a trade or business as a real estate dealer; except that the preceding provisions of this paragraph shall not apply to any income derived by the owner or tenant of land if (A) such income is derived under an arrangement, between the owner or tenant and another individual, which provides that such other individual shall produce agricultural or horticultural commodities (including live-

stock, bees, poultry, and fur-bearing animals and wildlife) on such land, and that there shall be material participation by the owner or tenant in the production or the management of the production of such agricultural or horticultural commodities, and (B) there is material participation by the owner or tenant with respect to any such agricultural or horticultural commodity; * * *."

pense for the operation of the expensive farm machinery and depreciation thereon. This was a substantial item and for the two years in question was in the neighborhood of $2500 to $4000. The sharecropping tenants, on the other hand, were required to bear one-half the cost of insecticides, the entire cost of fertilizer, as well as the labor and simple farm tools for harvesting. Actually, of course, Mrs. Poole had to finance the cost of fertilizer which would run several thousands of dollars and her reimbursement would come as a back-charge against the tenants' share when and as the cotton was harvested, ginned and sold. After deducting back charges due by the sharecropper tenants, the proceeds of the cotton were split 50/50.[4]

In dealing with these undisputed facts much difficulty was encountered in the administrative process. We summarize these difficulties as well as their shifting nature, not to suggest that a correct position finally reached is undermined by any supposed errors of the past. Rather it is to emphasize the lack of basis for the ultimate conclusion that despite material participation, it was still rental, not farm, income because Mrs. Poole's non-financial contributions were through an agent, her son, Joe, and not personally.

The claim was first rejected in the Bureau by the Claims Auditor on the grounds that her "Material participation was performed by the son * * * who was not an employee * * * but was an independent contractor." This disallowance was approved by the Claims Authorizer on the same ground. On appeal to the Chief of Claims Authorization, the disallowance was affirmed because the earnings from the farm "are rentals from real estate and were not received in the course of a trade or business

as a real estate dealer" and the "material participation was performed by your son who was not your employee but was an Independent Contractor." This disallowance was upheld by the Chief of Area Office on the ground that it was farm rental and on the further ground that the Claimant "did not materially participate in the production or management of the crops either personally or through an employee." Next came the Referee's Decision made after a rather extended hearing in which Joe Poole testified and all of the prior papers were incorporated into the record. The Referee faced squarely up to the issue which he first delineated (see note 1, supra). After finding that "claimant had established upon the Record that she furnished substantial portion of machinery, implements, etc. * * which were used in the production of the commodity here involved; and [that] she also advanced cash or assumed financial responsibility for a substantial part of the expenses involved, she certainly did not periodically inspect the production activities on the land," he then answered in categorical terms the issue he had framed. He declared, "as this Referee interprets the meaning of the statute, such inspection cannot be validly exercised by an individual through delegation to an agent. It must be personal. It cannot be delegated!" He made it doubly clear by saying "Hence the Referee hereby flatly holds that one cannot 'materially participate' through an agent."

This brings us then to the decision of the highest appellate agency, the Appeals Council. It bears repeating that the Council first found that "the evidence shows that for more than 40 years [Mrs. Poole's] farm was actually operated and managed by her son as her agent." After stating "thus, the issue as stated above is

4. This was substantial business as Mrs. Poole's individual income tax returns reflect:

| Income from farming | 1955 | 1956 | 1957 |
|---|---|---|---|
| Sales of cotton, seed, and corn | $13,926.07 | $8,163.19 | $7,815.00 |
| Expenses | 4,614.78 | 4,855.38 | 5,694.56 |
| Operating Income | $ 9,311.29 | $3,307.81 | $2,120.44 |

clearly presented," the Council answered it categorically. "We believe, however, as found by the referee that a farmer cannot materially participate in the production of his crops without some *personal* activity." After summarizing some of the undisputed facts we have discussed about Mrs. Poole and her son Joe's activities, the translation of this conclusion into specific terms for this case we think was a non sequitur. "Without some personal services by her, all of the participation by her son, *as her agent*, is immaterial * * * While we agree [1] with the claimant's contention that the Act was intended to cover *farm operators* whether or not, they *personally* participated in the operation and management of their farms, to the same extent as other self-employed persons who operate their businesses solely through agents or employees, we [2] cannot agree that the *rental* income of a farm owner or tenant can constitute self-employment income without material participation by him *personally* in the production or management of production of the commodities raised." [5]

No one questions the soundness of conclusion [1] for the Secretary concedes than an invalid owner taking no part whatsoever in actual management decisions would be required to treat as self-employment income net amounts received from operations conducted wholly by agents and employees of a business such as a drugstore, mercantile establishment, hardware store, insurance agency, or the like. The eligibility for benefits and the liability for the payment of the tax are parallel.[6] But the decisive conclusion [2] does not follow from [1]. Indeed it really begs the question by calling the money received from this activity "*rental* income of a farm owner."

■■ So far as we are able to fathom it, the Secretary finds the requirement of "personal" activity in the unique circumstance that the matter is legislatively stated first as an exclusion to which there is a subsequent exception. But as we have intimated before, this ascribes to Congress too literal a purpose in the mechanical or grammatical formulation of its policy. Searching for that policy should not be frustrated by any supposed artificial rules of construction which would impose a niggardly or strict construction because one rather than another literary device is employed. Consequently, while this intermediate conclusion does not eliminate the further problem of the meaning of "materially participated" which we shall shortly discuss, we think that it is perfectly plain that by the operation of the 1956 Amendments on the 1954 Amendments Congress was intending to bring a new and major group of persons under the Act. It was as though the legislation affirmatively prescribed that net earnings from self-employment shall include such income derived under an arrangement between the owner of land and a tenant which requires that there be material participation by the landowner and in actual operation thereunder, there is in fact material participation by the owner in the production or management of the production of agricultural commodities. As thus phrased, it is an automatic self-executing definition of self-employment income of a particular kind and being self-employment income, it is not "rentals." That is all, we think, that Congress undertook to do by the grammatical device of an exception to an exclusion.[7]

5. Italics in the original. The Brackets are inserted as a convenient reference.

6. See Income Tax Regulations 1.1402(a)–1 (b) (2), 26 C.F.R. 1.1402(a)–1(b) (2), which provides that "The trade or business must be carried on by the individual, either personally or through agents or employees." See also Revenue Ruling 56–22, 1956–1 CB 558, as modified by Revenue Ruling 58–267, 1958–1, CB 327.

Revenue Ruling 57–58, Cumulative Bulletin 57–1, page 270, setting forth guides to be used in share-farming situations makes no explicit reference to operation through agents. To the extent of any disagreement between our decision and Example (4) we think the ruling is erroneous.

7. At least so much is borne out by the legislative history stressed by both parties here. The Report of the Committee on

When it comes to interpreting the phrase "materially participates" in the production or management of production of agricultural commodities, we think that Congress likewise used these words in a sense consistent with the broadening of coverage. Mere ownership of property let out to another on some basis by which the amount payable for use (rent) might come from crops produced was not an activity which Congress regarded as an employment or as generating income from employment. The 1956 Amendment did not touch this. But the variables of our complex rural economy, well known to Congress, presented other situations in which the owner of the land did much more than furnish the land (and for which he would receive his rental). He might, under the arrangement, determine the crops to be planted, the areas to be cultivated, the time of planting, the fertilization program, and the manner and time of harvesting. If these activities were of a material, i. e., substantial importance from a practical point of view, then the Amendment was to make such activities self-employment by the owner and the proceeds income from self-employment. Although Congress did not undertake to phrase it in any such legal categories, this was a recognition that under some arrangements, the two, the owner of the land and the so-called tenant, are engaged in a joint venture. The result would be that the owner of the land, as well as the tenant, would, in this way, be engaged in the business of farming.

Once that position is reached, there is nothing to distinguish it from other self-employment businesses. The person supplying the capital—whether land, factory building, storeroom, cash, furniture and fixtures, inventory, or the like—may operate that business wholly through agents and employees with no more effort or supervision on his part than receiving and depositing the fruits of their labors. Consequently, the material participation is not confined to *personal* activities. It may be through agents or employees and quite without regard to the method of their compensation.

In the same approach, we know at least today that agriculture is or may be big business. It takes more than land and a willing hand. It takes working capital, frequently in considerable amounts. An owner of land who is required to (and does) furnish substantial amounts of cash, credit or supplies toward this mutual undertaking which are reasonably needed in the production of the agricultural commodity and from the success of which he must look for actual recoupment likewise makes a "material participation." One is hardly a mere landlord in the traditional sense if he must risk considerable funds in addition to the land in the success of the venture. And what he gets—or hopes to get—is more than rent. It is profit from the operation of a business, a business fraught with financial risks—the business of producing agricultural commodities.

All this is borne out by the legislative history. Quite naturally each cites portions as favorable to one view rather than the other. But as Congressional purpose is not generally to be found in mere literalism of the statute,[8] neither

Finance under the heading of "Purpose and Scope of the Bill * * * (1) Further extension of the coverage of the program" stated this. "Your committee has consistently held the view that the coverage of the program should be as nearly universal as is practicable. Coverage would be extended by the committee's bill to additional groups, primarily certain professional self-employed persons. Modifications would be made in the coverage requirements for farmers and farm workers to take into account the practical problems that have arisen since they were brought into the program by the 1954 amendments. Changes would be made in the provisions on insured status and benefit computations to give the newly covered groups equitable treatment as compared with those brought in earlier." Senate Calendar No. 2156, 84th Cong., 2d Sess., Rpt. 2133, p. 1.

8. United States v. American Trucking Ass'ns, Inc. et al., 1940, 310 U.S. 534,

may it be divined by a garbled excision of portions of legislative history or, as here, an undue emphasis upon words as conjunctives.[9]

■ The result is that, on the undisputed facts of this record and the findings made by the Secretary, Mrs. Poole through her son, Joe, as her agent, made a "material participation" in the production or management of the production of cotton and corn. This was done both in the supervision of the operation of the farm, the making of critically important decisions, and in the supplying of essential and substantial amounts of cash and credit and services performed by others at her expense. The arrangements made in her behalf by her son, Joe, with the sharecropper tenants required her to make substantial material contributions and these she made, either through her son, or directly in the case of the financial contributions. This is what the statute requires. This income was clearly self-employment income subject to tax. Since the income was subject to tax, she was eligible for the benefits. The decision of the Appeals Council should be reversed and a suitable order entered by the Secretary granting appropriate benefits.

Reversed.

543, 60 S.Ct. 1059, 84 L.Ed. 1345; United States v. Morris, 5 Cir., 1958, 252 F.2d 643, 649; Peacock v. Lubbock Compress Co., 5 Cir., 1958, 252 F.2d 892, 895; Fulford v. Forman, 5 Cir., 1957, 245 F.2d 145, 149.

9. For example, the Secretary insists that the word "also" in the following excerpt requires both physical work in the nature of personal supervision as well as financial contribution. "If the owner or tenant *also* establishes the fact that he furnishes a substantial portion of the machinery, implements, and livestock used in the production of the commodities, or that he furnishes or advances, or assumes financial responsibility for, a substantial part of the expense (other than labor

expense) involved in the production of the commodities, the committee feels that he will have established the existence of the degree of participation contemplated by the amendment." Senate Calendar No. 2156, 84th Cong., 2d Sess., Rpt. 2133, p. 38.

Obviously, if the landowner personally engaged in the activities suggested in the committee report, he would, without doubt be making a "material participation." Financial contribution would not be necessary so the term "if * * * also" cannot be read to require both. Consequently, unless it is to suggest another and independent way of making a material participation, the committee illustration was superfluous.