There is adequate factual basis for the court's assertion of jurisdiction.

▇ The evidence falls short of conclusively establishing the plaintiff's desertion of his wife and his adultery.

The evidence is that the plaintiff and his wife finally separated in November 1954, the wife remaining in the home and the plaintiff going to live in a small house owned by Curry Electric Company. The plaintiff said that the separation was the result of years of friction. He said: "We constantly battled." And he said that his wife embarrassed him in public by making fun of him, that they were incompatible, and that "we also had considerable battles over sex," because his wife denied herself to him sexually. The defendant's contention, on the other hand, is that the plaintiff left her "to take up residence with a paramour." It is true that after the separation the plaintiff hired a woman to act as his housekeeper. And it is true that after the plaintiff separated from his wife he purchased a series of cabin cruisers on which he entertained prospective customers and that he took his housekeeper along on cruises, he said, as a servant to mix cocktails and otherwise wait upon his guests.

This evidence is enough to arouse suspicion. But housekeepers are not necessarily mistresses. In the absence of any evidence that the plaintiff and his house-keeper had been surprised in a compromising situation, the court could rationally believe the plaintiff's categorical testimony that he had not left home to live in adultery with his housekeeper. The evidence raises issues of fact. We cannot say the resolution of those issues by the court below was "clearly erroneous."

Judgment will be entered affirming the decree of the District Court.

Anthony J. **CELEBREZZE**, Secretary of Health, Education and Welfare, Appellant,

v.

Martin **WIFSTAD**, Appellee.

No. 17021.

United States Court of Appeals Eighth Circuit.

March 6, 1963.

Jerry C. Straus, Atty., Dept. of Justice, Washington, D. C., for appellant and Joseph D. Guilfoyle, Acting Asst. Atty. Gen., Washington, D. C., John O. Garaas,

U. S. Atty., Fargo, N. D., and John G. Laughlin, Atty., U. S. Dept of Justice, Washington, D. C., on the brief.

Fred E. Whisenand, Jr., of Davidson & Whisenand, Williston, N. D., and Wallace L. Herreid, Crosby, N. D., for appellee.

Before VOGEL, BLACKMUN and RIDGE, Circuit Judges.

RIDGE, Circuit Judge.

Appellee's application for old-age insurance benefits under the Social Security Act (42 U.S.C.A. § 401, etc.) based on a claim of self-employment income derived from farm land having been denied by the Secretary of Health, Education and Welfare, he commenced this action under Section 205(g) of the Act (42 U.S.C.A. § 405(g)) to have that administrative determination judicially reviewed. The District Court, by its opinion recorded at 198 F.Supp. 198, reversed the decision of the Secretary and ordered payment of appellee's old-age insurance benefits claim.

■ The Secretary has appealed therefrom, claiming that the District Court erred in failing to treat his determination—that appellee had not satisfied the requirements for "material participation in the production or management of production" as required by Section 211(a) of the Social Security Act (42 U.S.C.A. § 411(a))—"as a conclusive factual determination, supported by substantial evidence." Hence the issue for our determination is whether under the undisputed facts here appellee established that he had an "arrangement" with the cultivator of his farm land which provided for appellee's "material participation" in the "management of the production of—agricultural—commodities" thereon and that he did in fact so participate. Hence "we have before us—a fully reviewable question of law," (Conlay v. Ribicoff, 294 F.2d 190, 194 (9 Cir. 1961) for the evidentiary facts and the reasonable inferences therefrom will provide an answer as to whether the Secretary has made a proper determination of the applicability of Section 211(a) (1) supra to the facts here involved.

■■ In the light of the growing judicial decisions in the field of claims for old-age insurance benefits based on self-employment income from farm operations it would be superfluous for us to restate applicable law and the standards for our review of the Secretary's decision in the case at bar. Foster v. Celebrezze, 313 F. 2d 604 (8 Cir. 1963); Hoffman v. Ribicoff, 305 F.2d 1 (8 Cir. 1962); Conley v. Ribicoff, supra; Harper v. Flemming, 288 F.2d 61 (4 Cir. 1961); Henderson v. Flemming, 283 F.2d 882 (5 Cir. 1960); Boyd v. Folsom, 257 F.2d 778 (3 Cir. 1958). We think it sufficient to say that judicial review under the circumstances here depends upon whether the Referee's decision denying appellee's claim, which became the final decision of the Secretary, is supported by substantial evidence, as provided in Section 205(g) of the Act, supra. Judicial review under that section demands that a reviewing court satisfy itself "that the agency determination has warrant in the record, viewing that record as a whole, and a reasonable basis in law" therefor. Boyd v. Folsom, supra, l. c. 781. The performance of that judicial function can only be accomplished by a "case-to-case consideration." Hoffman v. Ribicoff, supra, l. c. 9; Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

The facts in the case at bar may be tersely stated as follows: Appellee, a bachelor 76 years of age, owned 480 acres of land in North Dakota which he had dry-farmed for many years prior to 1951 or 1952. At that time, because of a heart condition, he made an "arrangement" with Merle Gunlock, his adjoining neighbor, to farm his (appellee's) farm. That arrangement was oral and has always remained so. Although appellee and Gunlock "never did talk about a contract" it is manifest that the "meeting of minds" was that Gunlock would furnish the seed, do the seeding and cultivation and would pay one-half the combining, spraying and harvesting expense, appellee would pay the other half of such expense, maintain the two granaries on

the farm; that they would talk over the farm operations, but appellee would have final say as to decisions thereon; and the crop would be split three-fourths to Gunlock and one-fourth to appellee. However, that "arrangement" was changed in 1956. Appellee then agreed to, and did thereafter, select and furnish all the seed, pay fifty per cent (50%) of the combining, spraying and harvesting and the cost of hauling the grain to the elevator where the crop was divided fifty-fifty. In Gunlock's own language:

"—we then started renting that way.—He (appellee) had to look after his interest then, you see— like he had to furnish the seed and he told me what he wanted summer fallowed, and he had to hire me to haul his share of the grain. He had to pay half the combining—spraying —and more or less I was from then on—working for him (i. e. for appellee)."

When the original arrangement was first made between appellee and Gunlock —appellee was at his farm every week in the summertime and talked over with Gunlock the farm operations, i. e. about the seed to be sown, the planting thereof, the cultivation of the soil, spraying, weeding, what land was to be summer fallowed, and he was always present at harvesting. In 1956–1957, appellee visited his farm less often as he was required to give up his automobile on advice of his doctor who told him he should not drive alone with his heart condition. Yet he did visit the farm six to eight times during the planting and growing season, inspected the crops and talked over with Gunlock the cultivation, weeding and spraying for grasshoppers, and harvesting activities on the farm. Between visits to the farm he had a telephone available to discuss farm conditions with Gunlock, and did so.

One issue here is whether there was an "arrangement" between appellee and Gunlock which provided for "material participation" by appellee "in the production of agricultural—commodities" on his farm, within the ambit of 211(a) (1)

supra. The Referee, in his decision which was adopted verbatim by the Secretary, concluded, "there is no evidence here of an 'arrangement' calling for material participation" by appellee. In this connection, the Referee said:

"It is difficult for the hearing examiner to piece together from the alleged oral agreement under which the parties operated, any evidence that the parties had any 'arrangement' providing for material participation by the claimant. Of course, the oral agreement did not spell out any 'arrangement' for material participation. In the absence of any 'arrangement' the issue of actual *material participation* does not arise, Secondly, as aforestated, in the absence of any *'arrangement'* activities which are purely voluntary on the part of the landlord do not count. However, for the sake of discussion, we will presume, without conceding, the existence of an 'arrangement' to materially participate, if we find *actual* material participation."

Since the final decision of the Hearing Examiner was solely premised in a finding "that claimant did not materially participate in the production or management of production of farm commodities in either 1957 or 1958" and there was no specific finding either way that appellee had an "arrangement to materially participate" in the production, we think the only legal conclusion to be reached from the facts is that there was such an "arrangement" between appellee and Gunlock, within the ambit of Section 211(a) (1) of the Act supra.

It is manifest from the record here that throughout the existence of the "arrangement" between appellee and Gunlock they conferred on all farming operations, that they never had any misunderstanding in respect thereto, that Gunlock considered his farming was to be in accordance to appellee's desires and that he considered appellee had to be satisfied in respect to his (Gunlock's) farming

operations. This is made evident by Gunlock's testimony when he said:

"Q. Who would have the final say on spraying?

"A. Well——

"Q. Let's assume that you and he didn't agree. He saw a few grasshoppers and—let's say, the whole thing's going to cost $75 to spray them—'let's not'. And you thought 'Let's.' Suppose that situation—who would—whose decision would control?

"A. Well, we've never come to any understanding like that. I know —I know when we were infested with grasshoppers there, why—why Martin (appellee) was the first one to suggest spraying, and, of course, I agreed upon it. And, of course, it was done by——

"Q. It was a joint decision in other words.

"A. Not necessarily. He's the one that wanted to do the spraying, you see."

As a consequence, the Referee in his report stated:

"When they did consult on this question they were in agreement, and a joint agreement was made to spray by airplane. The tenant conceded that in case of conflict the final decision in this area was with the claimant."

Appellee's positive testimony is: "I do all the inspecting and management necessary on my farm. I have the right to and do make all final management decisions." Although by his other testimony he did not spell out in detail all the directions and control of a managerial character performed by him, the only reasonable inference to be made from all the facts appearing in the record is that he did act in a managerial capacity. From a consideration of the record as a whole it appears that appellee and Gunlock did discuss and talk over all matters relating to the farm operations; that they always agreed thereon, but appellee very apparently had the final decision in all areas of such operations under the "arrangement" he had with Gunlock.

From the record here, there is no proof of facts to sustain the Referee's conclusion that the relationship of landlord and tenant existed between appellee and Gunlock. There is no manifestation by act, word or deed, that the "arrangement" between those parties provided for any "letting" or "leasing" of appellee's farm to Gunlock, whereby the latter was ever put in "possession" of the farm to the exclusion of full enjoyment and right of possession remaining in appellee. The legal inference from the facts is that "possession" of the farm land, at all times, remained in appellee, the owner thereof.

In 52 C.J.S. Landlord and Tenant § 797, p. 721, it is said:

"If the language used in the agreement imports a present demise of any character by which any interest in the land passes to the occupier or if the agreement confers upon the cultivator the exclusive possession of the premises, the relation of landlord and tenant will, as a general rule, be created, whereas if there is a joint occupation or an occupation which does not exclude the owner from possession the contract is a mere letting on shares, and the relation of landlord and tenant is not created thereby, the occupier being a mere cultivator or cropper."

In accord: Gibbons v. Huntsinger, 105 Mont. 562, 74 P.2d 443 (1937); Hampton v. Struve, 160 Neb. 305, 70 N.W.2d 74 (1955); Paulson v. Rogis, 247 Iowa 893, 77 N.W.2d 33, (1956); Davis v. Burton, 126 Mont. 137, 246 P.2d 236 (1952); Wilke v. Simon, 46 S.D. 422, 193 N.W. 666 (1923); Minneapolis Iron Store Co. v. Branum, 36 N.D. 355, 162 N.W. 543 L.R.A.1917E, 298 (1917); Marken v. Robideaux Grain Co., 56 N.D. 94, 216 N. W. 197 (1927).

Ordinarily, in the absence of a specific agreement therefor, a partnership will not be inferred between a landowner and the cultivator of his land. But, a con-

tract for the cultivation of land on shares such as here established may constitute a joint adventure between appellee and Gunlock whereby they jointly engaged in cultivation of the farm land in question, the one furnishing the land and management and the other the labor and machinery, both sharing the expenses of cultivation, spraying and harvesting, and agreeing to divide the crops. Such agreement possesses every element of a joint adventure in the operation of farm land. See 52 C.J.S. Landlord and Tenant, § 798, p. 723. All that is essential to a legal absolutism concerning that matter is to find the intent of the parties, which under the facts here can only be determined by the rule concerning subsequent action of the parties as a criterion of interpretation of their agreement, in the absence of evidence of specific agreement thereon. That is a legal question, stated in Restatement, Contracts, § 235(e) as follows:

> "If the conduct of the parties subsequent to a manifestation of intention indicates that all the parties placed a particular interpretation upon it, that meaning is adopted if a reasonable person could attach it to the manifestation."

In review of the record here, as a whole, we think it is made manifest that appellee and Gunlock had a meeting of minds and intended as a part of their "arrangement" that it was to be as appellee put it, "I'm out there telling him how to do everything" and such was an integral part of their original agreement. Any inference *contra* in the setting of this case, at the critical time of appellee's right to claim old-age benefits, considering the area of production of agriculture where appellee's farm was situated, the conduct of the parties, and the manner by which grain production operations were conducted on appellee's farm, seems to us to be a misinterpretation of the "arrangement" appellee and Gunlock intended.

OASI Bulletin 135, §§ 1007–1012, gives some guides as to the existence of a partnership or joint adventure, as the Secretary considers that subject. § 1008 thereof states "some factors indicative" thereof to be:

A. Conduct of the business as a joint undertaking, not as a sole ownership; (Such is the proof here)

B. Contribution of capital or service to the business by each party; (Such is the proof here)

C. A sharing in management decisions and other responsibilities; (Such is the proof here)

D. A sharing in the profits and risk of loss in accordance with the parties' agreement. (Such is the proof here)

E. A holding out of the business to the public in such manner as to indicate that the parties are partners.

There is no evidence of such a holding out. However, as said by the Secretary: "It is not necessary that all of these factors be present in order for an arrangement to be considered a partnership or joint adventure."

In Section 1022 of that bulletin, it is said:

> "—(I)f both the farm owner and the person working the land are involved in the management and control of the farm operations or in the day-to-day operations of the farm, they may be partners (and) both parties are farm operators and self-employed."

In such bulletin the Secretary treats "partnerships" and "joint adventures" as being synonymous. The parties to a joint adventure need not always be jointly involved in management or jointly involved in physical activities of production on the farm. See 30 Am.Jur., Joint Adventures, § 17, p. 951. Management and control may be in the owner of the land and the work done on the farm may be in another. The right to control of production on the land, and exercise of such control, we think, spells out "material participation" as required by Section 211(a) (1) of the Act supra. The legislative history of that section as set

forth in the Hoffman opinion, supra, at l. c. 5, makes that clear.

We think the Secretary erred in the case at bar by treating appellee and Gunlock as landlord and tenant when no such relationship was legally shown to exist. They should have been considered as "joint adventurers" in the farm operation in question. Seemingly, the Secretary was led to the erroneous conclusion that a landlord-and-tenant relation existed because the Referee assumed that to be the situation at the outset of the hearing on appellee's claim for old-age insurance benefits and he overlooked or was unfamiliar with the "dry-farming" operation as conducted in the area of agricultural production where appellee's farm was located.

For instance, the Hearing Examiner, at the commencement of such hearing, after explaining the nature and purpose thereof to appellee, said, in part, as follows:

"Hearing Examiner: Now, the procedure in this case is quite simple. We're going to ask you some questions——

"Martin Wifstad: Don't talk too big words 'cuz I don't understand.

"Hearing Examiner: All right.

Thereupon certain exhibits were marked and in respect thereto the Hearing Examiner said:

"Now, the exhibits in the record as we now have them, indicate that you are the owner of a 480-acre farm that has been operated by Merle Gunlock, who is not a relative of yours, under a *share crop agreement*, and that the *principal source* of income was grain—wheat, barley, flax, and so forth; and that you included crop share rentals in the amounts reported as self-employment income. From the various statements made, it would appear that Merle Gunlock, *your tenant, leased* these lands under some sort of *oral agreement*—no written agreement——

"Martin Wifstad: No.

"Hearing Examiner: ——and the claimant, that's you, as your share of the *rentals* received one-half of the grain produced and the *tenant* received the other one-half.——

"Martin Wifstad: Yah.

"Hearing Examiner: ——and you shared expenses pursuant to the statements you've made contained in the farm questionnaires which are all part of the record. Now, the Bureau determined that you did not materially participate in the production or in the management of production on the farm in either of those years.

"Martin Wifstad: Well, I did." (Emphasis added)

Under further examination by the Hearing Examiner, appellee testified:

"Q. Tell me a little bit what you do when you go out there to the farm. You tell me that you go out there about four or five times a year. What do you do when you go out there?

"A. Well, you've got to cultivate the summer fallow to get the weeds down.

"Q. You've got to cultivate summer fallow. All right.

"A. Yes.

"Q. Doesn't Gunlock know enough to do that without you telling him?

"A. Oh, yes, but then I've got to see it's done.

"Q. I see, in other words, the tenant does it on his own, but you just double check to make sure it's done.

"A. Yes.

"Q. Anything else done as a result of these inspections four or five times a year? Tell me what other recommendations or suggestions you make.

"A. Well, then we talk over what kind of wheat we've got to have, you know.

"Q. When do you do that—in the spring or in the fall?

"A. In the spring. The kind of seed we're going to have. It rusts once in a while. We've got to get the rust-proof wheat.

"Q. In other words, in the spring of the year, you decide on what seed to use.

"A. Yes.

"Q. Any other things that you talked about?

"A. I can't think of anything else.

"Q. O. K.

"A. I'm doing all I'm suppose to do.

"Q. Do you consider Mr. Gunlock a good sound tenant?

"A. Yes.

"Q. Do you rely on his judgment?

"A. You mean, I O. K. it?

"Q. Not O. K. it, but if he does something on his own—can he do something on his own? Do you rely on him doing the right thing—do you rely—can you rely on his own judgment?

"A. I'm always out there.

"Q. But what if you're not out there?

"A. Well, he'll do it anyway.

"Q. O. K.

"A. But if there is anything, I call him up or I go out.

"Q. How long has it been, Mr. Wifstad, since you've done any physical work on the farm?

"A. About four years.

\*   \*   \*   \*   \*   \*

"Q. ——in other words, in our determination today we can forget about any physical work done by you, right? You don't claim that you've been a material participant because you actually weren't doing any field work?

"A. No, I don't.

"Q. You claim material participation managing?

"A. *I'm just managing.*"

The Referee said in his decision:

"Summing up the substantial credible evidence, it appears that after the farm plan was formulated in the spring, that is, deciding when, where, and what seed and what to summer fallow, *the day-to-day production activities* were left to the tenant. *The tenant could go ahead and harvest the grain when ripe without consulting the claimant.* The claimant admitted that the tenant was a good, successful and sound farmer, that the tenant exercised good judgment, and that he relied on the tenant's judgment." (Emphasis added.)

\*   \*   \*   \*   \*   \*

"The credible evidence establishes that the tenant was primarily responsible for production of agricultural commodities on the claimant's land, performed all the labor, provided the farm machinery, *paid a greater share of the farm expenses, and for all practical purposes, had full control and dominion over the land and over the operation and management* of the farm, and was not dependent upon his *aged landlord* to significantly assist him in the operations during the years in question." (Emphasis added.)

The hearing before the Referee lasted about two hours. His decision on the facts covers nineteen printed pages in the record on appeal. We think there is much errancy of fact as well as reasoning and conclusions stated therein. We briefly note it was stated in that decision:

"The hearing examiner was impressed with the claimant's honesty, candor, and sincerity."

At the conclusion of the hearing held by him he asked appellee:

"Before we adjourn, is there anything that you'd like to say?

"Martin Wifstad: We've told the truth.

"Hearing Examiner: Yes, I feel that all three gentlemen are very honest, frank, and candid about the answers, and I have no question about the truth or veracity of you three gentlemen. It's just a matter of evaluating the evidence as it is, whether there's any serious conflict."

There is no evidence that Gunlock "could" or did "go ahead and harvest the grain when ripe without consulting the claimant." The evidence is that appellee was always present at harvest-time and that he and Gunlock did consult regarding such activity, as well as all other operations of the farm, and appellee had "the right to and did make all final management decisions."

At the critical time to appellee's claim for old-age benefits, Gunlock did not pay "a greater share of the farm expenses, and (did not) for all practical purposes (have) full control and dominion over the land and over the operations and management of the farm"—and such are not reasonable inferences, factually or legally sustainable by the evidence here. On the contrary, appellee had "full control and dominion over the land" and paid the "greater share of the farm expense."

■■ Appellee's farm was a typical dry land, small grain operation in western North Dakota. There are no habitable quarters on the farm; only two grain barns were located thereon. Even when appellee farmed his land alone, he resided in town. We take judicial notice of "dry farming" operations. It is a subject one may consult in publications of the United States Department of Agriculture and the Departments of Agriculture of all the western states. But when one does, he will look in vain for any description or reference to " 'day-to-day' farm operations" in the theory thereof—which apparently seemed to be a cardinal point considered by the Referee in his decision in the case at bar, which he perceived but did not define. From all literature on the subject it is

clear that there are "few areas of decision for dry land farm operations." We need not review the technique thereof. It is sufficient to say that management of dry farming operations relate mainly to the storage and retention of moisture in the soil, the water requirements of plants as a basis for crop selection, soil management and methods of crop rotation and utilization and clean summer fallowing. And proper "summer fallowing" is recognized as of utmost importance to the success of such farm operation. Appellee very apparently recognized that to be a fact from his "experience" because it was one of the first subjects mentioned by him when he was asked to describe his management directions of production activities on his farm. Appellee could not have contributed anything more to "management of production" to the dry farming operations conducted on his farm than he did, had he been there every day in the year. That he had an "arrangement" with Gunlock to participate in the production of agricultural products on his land is manifest from the acts and conduct of the parties as to how such operations were conducted. That he did so participate is also established. Such is a legal conclusion to be made in applying appellee's claim for old-age benefits to the statutory standards, as established by the record as a whole, presently before us.

■ A significant matter appearing in the record of this case is that—very apparently, the Referee in arriving at his decision denying appellee's claim for old-age benefits, was influenced by the fact that Gunlock was "a good, successful and sound farmer, and was not dependent upon his *aged* landlord to significantly assist him in the operation" of his (appellee's) farm. The Referee emphasized that matter in his decision, first, by considering a single statement made by claimant, that "(i)f I'm not there he'll (Gunlock) do it anyway"; and, secondly, by reasoning that a young, modern and scientific farmer is more effective than a 76-year-old farmer, brought up in the "horse and buggy" days who has been

"dry farming" his own land for years, who knew the condition of the soil, what seeds to plant, what land to put in summer fallow, when in dry seasons to spray the crops, and how all that was to be done, because of years of experience. The fallacy of the Referee's reasoning is exemplified in the footnote, where he undertook to interrogate appellee's witness Albert Heide.[1] The philosophy the Referee there stated seemingly permeated all his reasoning when he came to consider the undisputed facts in the case at bar; so much so, that it became decisional in his mind, that appellee possibly did not participate in the "management

1. Mr. Albert Heide, County Treasurer of Divide County, North Dakota for 22 years, a witness on behalf of appellee, was examined by the Referee, in part, as follows:

Q. ——This is a hypothetical question I'm asking. It's predicated on these facts: 363 acres of land farmed by a tenant who has been farming for himself since 1952. A tenant who is well-versed in farming, who has good farming judgment. And suppose Mr. Wifstad took off and went down to Florida and retired. Or suppose the situation was that he was here every spring to formulate the farm plan and so forth—he tells him which acres to seed, and where to seed it, and what seed to use, and took off for Florida and didn't come back the entire year. Do you think his absence would have any significant effect on the farm yield?

"A. Well, of course——

"Q. I don't expect you to answer it, I just am asking if you have any opinion. That's up to you.

"A. I think he has a very good renter, but that they—now, it may be that with Martin's additional years in the farming game would mean that he gives him some good tips once in a while that helps to——

"Q. Let me ask you this in general, not in particular application to this case, but in general. I know that you are kind of a neutral party, yet you understand farming, you know farmers, and deal with farmers. What value is—let's take a 75 year old farmer who, excuse me, who is brought up in the horse and buggy days, if you pardon my expression—what value would his judgment be with reference to a farmer 45 years old who is brought up in the scentific farm age? Can you superimpose that judgment on a younger man's judgment and come up with an increase of farm yield, or have you just got a situation where two cooks are trying to spoil the broth?

"A. (Chuckling) I think that as in all areas of life, for instance, a doctor who has a son who becomes a doctor, and the fact that the father is still on the staff, I would rather go to that clinic because there alone because of the experience has the father was there than if the son was given him wisdom that the son hasn't got.

"Q. We're kind of getting off the subject, that medicine has reached the point— this is really no exaggeration—that a machine, if there were such a machine, could do a better job in evaluating a person's impairment than a man could. What I mean by that, if there were such a machine that could take your blood pressure, your blood count, your electrocardiogram, your BUN, and goodness knows what else besides, get all the results of these tests, and run them through an IBM machine and out comes a card saying 'This man is ready for the graveyard. He's got hypertension, blah, blah, blah.' Seriously, that type of scientific evaluation based upon—it's really a mathematical evaluation based upon medical tests, is so far superior to any so-called country doctor, or the city doctor, or general practitioner, who through age and experience can render that it's the difference between night and day. It's a scientific fact. A lot of people like an old doctor because of his experience—not me, I know better—in my own experience and in the experience of my family. And you can talk about old lawyers—'Oh, I like to go to an old lawyer—he knows all the tricks.' It's a lot of baloney! A young man out of law school with two years' experience is a far sounder lawyer today than a lawyer practicing for 25 years, exclusive of certain courtroom tricks, which are kind of meaningless nowadays because the tricks in the trade are gone as far as lawyers go, as you probably know. New discovery procedures and depositions—there aren't any more tricks—both sides know what the other side has—they've prepared the case for six months or so— pictures and statements, and so forth. It's like the courtroom lawyer of the past—it's a thing of the past—the same with the old country doctor, and city doctors of the past. A doctor can tell more in a two-hour examination, taking the blood pressure and so forth, than going to an old doctor who will look at him, and take his blood pressure and so forth. We are sort of getting off the subject, but getting back to our subject which is a

of production of agricultural commodities" on his farm. Manifestly, such philosophy is unsound, to say the least, and *contra* to the concept of self-employment coverage as contemplated by the Congress in the enactment of Section 211(a) (1) supra. (Cf.) Harper v. Flemming, supra, l.c. 63, 64. Ordinarily. "fallacy of reasoning" such as appears in the footnote will not singularly be latched upon as grounds for reversal of an administrative order, if the conclusion reached by the fact-finding body has other reasonable evidentiary basis in the record therefor. Hoffman v. Ribicoff, supra, l. c. 6. But where, as here, it appears to have become decisional, we cannot disregard it. "The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." Securities and Exchange Commission v. Chenery Corp., 318 U.S. 80, 87, 63 S.Ct. 454, 87 L.Ed. 626 (1942).

At bottom the "substantial evidence" requirement of Section 205(g) supra controlling review here, places the burden of persuasion upon the applicant to establish his right to Social Security Benefits, but that:

"does not demand that the (appellee) settle all problems or even all the important problems that arise in connection with the operation of (his) farm, for the word 'participation' denotes joint activity in the entire enterprise and its modifier 'material' only requires that the activity be of substantial value or importance. No decisions are conceivable under the present facts that are more important to the enterprise than those relating to the type and quantity of the crops"

the cultivation of the land and the manner in which crops were grown on ap-

pellee's farm. Conley v. Ribicoff, 294 F. 2d l. c. 195. So far as wheat was grown thereon, the quantity admittedly was subject to control by ASC Regulations. But, the type and quality of the wheat seed that was sown, as well as that of barley and flax, was selected by appellee. This because of his long experience with dry farming operations on his land. The risk of profit from such operation was one jointly shared by appellee and Gunlock. If the crop failed they both lost— abundant harvest produced their profit. Appellee cannot be penalized because he joined in that joint adventure with a "good successful and sound farmer" which very apparently was also a reasoned premise for the Referee's decision here. That is and was an unreasonable inference and conclusion on which to premise a denial of appellee's claim for old-age benefits.

■ When the facts here are tested by the proper legal standard they demonstrate that appellee is entitled to old-age insurance benefits under Section 211(a) (1) of the Act, supra. We cannot sustain the negative answer as given to that claim by the Secretary in the case at bar because there is no substantial evidence which affords a basis therefor. Kerner v. Flemming, 283 F.2d 916 (2 Cir. 1960); Butler v. Flemming, 288 F.2d 591 (5 Cir. 1961).

The Secretary's singular reliance on our opinion in Hoffman v. Ribicoff, supra, to sustain such a denial is misplaced. The facts in the case at bar are clearly distinguishable from those found and the issues that existed in that opinion of ours. In the Hoffman case there was a specific finding that no arrangement existed at the critical time of Hoffman's qualification for old-age insurance benefits. There was also a specific finding that he did not, personally or vicariously, "par-

---

farm question, is there any value that an old gentleman who has been brought up in a different theory or different era of agriculture—is his judgment significant?

"A. Well, I have a father that's on the farm and manages the farm—not the one

I have, but I notice that he raises a better crop than I do.

"Q. That's the answer. I don't know.

"A. I think it is experience. Now, I think what you said about the doctor is correct, but even at that, experience does give you something that nothing else gives you."

ticipate in the management of production" on his farm land. There was substantial evidence concerning both such findings and that is what was sustained by our review in that case.

Affirmed.