John R. McCORMICK, Plaintiff-Appellant,

v.

Elliot L. RICHARDSON, Secretary of Health, Education and Welfare, and the United States of America, Defendants-Appellees.

No. 71–1009.

United States Court of Appeals, Tenth Circuit.

April 14, 1972.

Rehearing Denied June 7, 1972.

Lynnie Clayton Spahn, Oklahoma City, Okl., for plaintiff-appellant.

William Kanter, Atty., Dept. of Justice (L. Patrick Gray, III, Asst. Atty. Gen., Dept. of Justice, William R. Burkett, U. S. Atty., and Kathryn H. Baldwin, Atty., Dept. of Justice, on the brief), for defendants-appellees.

Before PHILLIPS, MURRAH and HILL, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge.

McCormick brought this action pursuant to 42 U.S.C. § 405(g) to review a decision of the Secretary of Health, Education and Welfare, hereinafter referred to as the Secretary, denying McCormick insurance benefits on net earnings from self-employment.

McCormick was the owner of 160 acres of land, located in Gold Hill Township, Gallatin County, Illinois, and 40 acres of land, located in North Fork Township in the same county. McCormick was awarded insurance benefits for the latter tract, and it is no longer involved in this proceeding.

The first 28 years of McCormick's life were spent on his father's farm in Gallatin County, Illinois, except for time spent in acquiring an education and in military service. For 30 years prior to February 28, 1965, McCormick was employed in the Internal Revenue Service of the United States. He retired from such employment on that date. By regulation he was prohibited from engaging in any other business during his employment with the Internal Revenue Service.

Prior to his retirement, McCormick's farms were rented on a share-crop basis and were looked after by his brother until the latter's death. Thereafter, they were looked after by his sister. His sister owned 40 acres of land adjoining his 40-acre tract.

Since 1958, the 160-acre farm had been farmed by George H. Brugger under an oral arrangement entered into between him and McCormick, by which Brugger received three-fifths and McCormick two-fifths of the products produced on such farm.

The oral agreement did not provide that the arrangement should continue for any definite period, and it could be terminated by either party by giving "proper notice" to the other party at the end of any crop year. In effect, it was on a year-to-year basis.

The details of the arrangement and the changes therein and additions thereto will appear, infra, as we continue this statement of the facts.

Upon his retirement in February 1965, McCormick began an active participation in the management of production of the 160-acre farm, which had become badly run down, no doubt due to improper husbandry. He entered into a contract with a third person for the clearing of a woodland area on the 160-acre farm, for the removal of the timber, brush and stumps therefrom, and the plowing and putting the soil in condition for planting in 1965. The contract was carried out at a cost to McCormick of $462.50.

After consultation with Brugger, the tenant of the 160-acre farm, McCormick and Brugger agreed that modern farm machinery was needed for the proper operation of the farm. In accordance with that agreement, Brugger purchased such machinery, consisting of a combine and sheller, two tractor plows, two disc harrow plows, one wheat drill, one corn planter, one rotary hoe, four wagons, a roller sprayer, and a steel harrow, at a cost of $12,400, and McCormick erected housing to provide shelter for such machinery when not being used, and for additional storage of crops grown on the 160-acre farm.

Prior to 1965, McCormick, in conjunction with the owner of an adjoining tract, had constructed a drainage ditch, which drained excess water from the lowlands on the 160-acre farm and the land of the adjoining owner and made it

suitable for raising crops. Thereafter, and up to and including the year 1967, McCormick bore all of the cost of maintaining and keeping clean that part of the ditch on his 160-acre farm.

Under the arrangement between McCormick and Brugger, McCormick paid all the cost of furnishing and spreading lime and rock phosphate on the 160-acre farm, all of the real estate taxes, insurance, the repair of buildings and fences, the cleaning and maintenance of the drainage ditch, and the cost of clover seed sown on such farm, and 40 per cent of the cost of the fertilizer, other than lime and phosphate, and the nitrogen, poison, and weed killer used on such farm. McCormick also paid the cost of applying the weed killer.

McCormick also furnished Brugger a dwelling house, three or four acres for a garden plot, ground for growing potatoes, and pasture for cows and hogs. Brugger furnished the seed for wheat, corn, and soybeans, and 60 per cent of the cost of fertilizer, nitrogen, poison, and weed killer. The 60 per cent of the cost of the fertilizer did not include the lime and rock phosphate.

An adequate amount of lime in the soil is essential to a high level of production of crops. This is especially true of corn. When the soil becomes depleted of the requisite amount of natural lime therein, it should be replenished by the spreading of lime thereon. When so used, lime is characterized as a fertilizer. Timely soil tests should be made, and when they indicate the lime content has reached or is about to reach a level below the amount of lime needed, additional lime should be spread. McCormick determined when soil tests should be made and had them made.

Brugger did the plowing, the preparation of the land for planting, except the cleared woodland tract in 1965, and the planting, cultivating, harvesting and marketing, and marketed McCormick's share when directed to do so by McCormick.

Beginning in the spring of 1965, McCormick made regular inspection trips to the farm, one in the spring or early summer, shortly after the crops had been planted, and one in the late summer at harvest time. He also made trips to the farm between those regular inspections, when necessary, and consulted with Brugger by telephone or through his sister, who lived a short distance from the 160-acre farm, the sister acting under directions from McCormick.

Each fall, McCormick made a careful inspection of virtually every acre of the cultivated lands and took note of the production therefrom and the quantity of each grain or product produced. He discussed with Brugger the kind and quantity of fertilizer that was best suited to the soil and would be needed for the next year's crop. McCormick also took notice of how the ground was seeded, the use of weed killer, and also noted whether there were any washed-out areas which should be plowed with a contour plow, rather than a regular plow.

McCormick had aerial photographs made, which showed the different fields of the 160-acre farm.

From these inspections, McCormick, after consultation with Brugger, determined what plans for rotation of crops should be followed during the coming year, which fields should be planted to corn or wheat or soybeans, or rested and planted to clover. McCormick and Brugger usually agreed, but in the event of disagreement, after February 1965, it was understood that McCormick reserved the right to insist that his views be followed.

Rotation of crops is essential to good farm husbandry, especially to restore land that has become "run down" due to the lack thereof. A careful plan for rotating crops was worked out by McCormick after consultation with Brugger, beginning in the fall of 1965, and each fall thereafter.

In the spring inspection made regularly by McCormick, shortly after the planting was completed, he again walked over virtually every acre of the tilled acreage of the 160-acre farm and examined it to see if the plans arrived at in the preceding fall had been followed. He further inspected the seed beds, the planting technique followed, examined whether the proper distance between hills of corn and soy beans had been followed, and whether the drainage ditches were clear and provided proper drainage. McCormick also made trips to the farm between regular inspections when important decisions had to be arrived at, or made decisions by telephone through his sister.

Some areas of the farm land were infested with Johnson Grass, and others with volunteer cane. In the areas infested with cane, McCormick decided the Government wheat plan should be entered into and the cane mowed several times during the growing seasons. By so doing, he was able to bring about the killing of the volunteer cane. McCormick always decided whether a Government crop plan should be entered into.

In the areas infested with Johnson Grass, which reproduces from both seeds and roots, McCormick decided to experiment with a chemical to poison the grass. He was only partially successful. He then devised a plan to sow the field infested with Johnson Grass with wheat, after a corn crop thereon had been harvested, and during the next summer, after the fall wheat crop had been harvested, to spray the grass several times with a new chemical poison. Such spraying reached not only the grass, itself, but its roots, and resulted in the elimination of the Johnson Grass.

The elimination of the volunteer cane and the Johnson Grass greatly increased the production on the 160-acre farm.

42 U.S.C. § 411, in part here material, reads:

"For the purposes of this subchapter —

\* \* \* \* \* \*

"(a) The term 'net earnings from self-employment' means the gross income, as computed under chapter 1 of Title 26, Internal Revenue Code of 1939, derived by an individual from any trade or business carried on by such individual, less the deductions allowed under such chapter which are attributable to such trade or business, \* \* \* except that in computing such gross income and deductions \* \* \*

"(1) There shall be excluded rentals from real estate and from personal property leased with the real estate (including such rentals paid in crop shares), \* \* \* except that the preceding provisions of this paragraph shall not apply to any income derived by the owner \* \* \* if (A) such income is derived under an arrangement, between the owner \* \* \* and another individual, which provides that such other individual shall produce agricultural \* \* \* commodities \* \* \* on such land, and that there shall be material participation by the owner \* \* \* in the production or the management of the production of such agricultural \* \* \* commodities, \* \* \* "

The precise question here presented is whether there was material participation by McCormick in the production or the management of the production of such agricultural commodities.

The record also shows that between 1965 and 1967 the farm income to McCormick greatly increased. In 1965, his farm income was $2,036.54; in 1966, it was $3,093.93; and in 1967, it was $4,037.07.

It further shows that McCormick's self-employment tax was $126.18 in

1965; $209.81 in 1966; and $285.85 in 1967.[1]

We think that the agreement between McCormick and Brugger, no doubt initiated by McCormick, whereby Brugger was to purchase and use new modern machinery in the operation of the farm and McCormick was to construct at his own expense new buildings in which to house and protect such machinery when not in use; the provision of additional storage; the cleaning, repair, and maintaining of the drainage ditch in proper condition so it would drain the excess water from the lowlands; the killing of Johnson Grass and volunteer cane; the careful planning in the fall of each year of the crops to be planted and where they should be planted in the succeeding year; and the carrying out of a carefully planned crop rotation that brought the 160-acre farm back from a poor condition to a good condition and caused a very substantial, indeed remarkable, increase in the crops produced thereon, constituted material participation by McCormick in the management of the production of agricultural commodities on the 160-acre farm.

The record clearly shows that McCormick actively participated in every important decision that was made which materially affected production; that in the event of disagreement his views were to and did prevail; that he initiated many actions and of his own volition carried out several actions, all of which materially increased production; and by planning and requiring the carrying out each year of proper crop rotation, he built the 160-acre farm up from a farm of "badly run down condition" to one of good condition and susceptible of a high level of production.

It seems clear to us that while McCormick did not engage in any physical labor in the preparation of the soil, the cultivating and growing of crops, and the harvesting thereof, he did make a very substantial and helpful contribution to the management of production, which resulted in a very large increase in the amount of the crops produced and brought him within the exception of § 411(a) (1), supra.

In arriving at our conclusion, we are not unmindful that McCormick did not participate physically in the farming operation. However, we are of the opinion that the statute contemplates two kinds of participation:

1. Material participation by the owner in the production of agricultural commodities; and

2. Material participation by the owner in the management of production of agricultural commodities.

The phrase, "the management of the production of such agricultural * * * commodities" means, we hold, the determination of what shall be done or carried out which will affect production and how and by whom it shall be done or carried out. And it does not mean the physical exertion by which the actual doing or carrying out of the operation is accomplished. Hence, physical participation is not required.[2]

We think there can be no doubt that McCormick, as the owner of the 160-acre farm, materially participated in the management of the production of agri-

1. McCormick duly returned and paid taxes on his net farm income for the years 1965 to 1967, inclusive, and probably for the year 1968, treating such income as income of a self-employed person. The Government undertook to return such payments by checks mailed to him. In his claim filed with the Department of Health, Education and Welfare and the Social Security Administration, McCormick recited that checks sent to him as refunds of self-employment taxes paid by him were received, but that he would not cash the checks, pending the disposition of his claim.

2. Hoffman v. Gardner, 8 Cir., 369 F.2d 837, 842; Celebrezze v. Miller, 5 Cir., 333 F.2d 29, 31; Celebrezze v. Wifstad, 8 Cir., 314 F.2d 208, 213; Conley v. Ribicoff, 9 Cir., 294 F.2d 190, 192; Harper v. Flemming, 4 Cir., 288 F.2d 61, 64; Henderson v. Flemming, 5 Cir., 283 F.2d 882, 888.

cultural commodities from such farm: (1) By bringing about the purchase and use of new and modern machinery by Brugger in carrying out the farming operation on the 160-acre farm, and thereby increasing the production of such commodities on such farm; (2) by clearing the wooded tract and putting it in condition for planting in 1965, and by cleaning and maintaining the drainage ditch, which substantially increased the acreage for growing such agricultural commodities on such farm and increased the production thereof; (3) by careful planning in the fall of each year, in the light of results of the previous crop year, what areas should be planted to corn, to soybeans, or to wheat, and what areas should be planted to clover, thereby effecting proper crop rotation, which brought back the farm from poor condition to good condition and greatly increased the production of such commodities therefrom; and (4) by other participation set out, supra.

Accordingly, the case is REMANDED, with instructions to compute and award insurance benefits to McCormick on the basis of the income derived by him from the 160-acre farm.

## ON PETITION FOR REHEARING

### PER CURIAM.

McCormick was the owner of a 160-acre farm in Gallatin County, Illinois. In the years 1965, 1966, and 1967, such land was farmed under an arrangement between McCormick and one Brugger, the details of which are set out in our opinion.

McCormick filed a civil action pursuant to 42 U.S.C.A. § 405(g) to review a decision of the Secretary denying him insurance benefits on net earnings derived by him from such land, as earnings from self-employment in such years, in the United States District Court for the Western District of Oklahoma. The decision of the District Court was adverse to him. Thereupon, he duly sought review thereof by an appeal to this court, also provided for in § 405(g), supra.

The court handed down its decision on the appeal on April 14, 1972. On May 24, 1972, the appellees filed a petition for rehearing and a suggestion for rehearing in banc.

In the petition for rehearing, counsel for appellees assert that this court in its decision exceeded the scope of its jurisdiction on review and failed to observe well established limitations on the scope of review by the courts of decisions of the Secretary in cases like the instant case. We respectfully disagree, and state that counsel for appellees have wholly misconceived the basis of our decision. We were not unaware that the "findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive" (§ 405(g), supra).

42 U.S.C.A. § 411, in part here material, reads:

"For the purposes of this subchapter—

\*     \*     \*     \*     \*     \*

"(a) The term 'net earnings from self-employment' means the gross income, as computed under chapter 1 of Title 26, Internal Revenue Code of 1939, derived by an individual from any trade or business carried on by such individual, less the deductions allowed under such chapter which are attributable to such trade or business, \* \* \* except that in computing such gross income and deductions \* \* \*

"(1) There shall be excluded rentals from real estate and from personal property leased with the real estate (including such rentals paid in crop shares), \* \* \* except that the preceding provisions of this paragraph shall not apply to any income derived by the owner \* \* \* if (A) such income is derived under an arrangement, between the owner \* \* \* and another individual, which provides that such other individual shall produce agricultural \* \* \* commodities \* \* \* on such land, and that there shall be material participation by the owner \* \* \* in the production or the management of the production of

such agricultural * * * commodities, * * *."

The crucial question presented in this case is whether in the years 1965, 1966, and 1967 there was "material participation" by McCormick as "owner * * * in the * * * management of the production of * * * agricultural * * * commodities" on such farm.

After a careful examination of the appendix and the record certified up to the District Court by the Secretary, we reached the conclusion that the Secretary and the District Court erred in their construction of the phrase "material participation by the owner * * * in the * * * management of the production of such agricultural * * * commodities" and laid down requirements to constitute material participation by the owner in the management of production not justified by the language of the statute.

After reaching that conclusion, we stated in the opinion what we thought was required to constitute participation by the owner in the management of production of such agricultural commodities, and we set forth facts reflected by the evidence in the record, which in our judgment was not in anywise contradicted nor impeached.

From the foregoing, we concluded that under a proper construction of the statute, McCormick, in the years 1965, 1966, and 1967, had materially participated, as owner of the land, in the management of the production of agricultural commodities therefrom.

In accordance with the provisions of § 405(g), supra, we entered a judgment reversing the decision of the Secretary, based on errors of law, and directed that he make an award to McCormick.

The petition for rehearing is denied.