Elizabeth I. VANCE

v.

Abraham A. RIBICOFF, Secretary of Health, Education and Welfare.

Civ. No. 4211.

United States District Court
E. D. Tennessee, N. D.

Dec. 19, 1961.

---

Ambrose, Wilson & Saulpaw, Knoxville, Tenn., for claimant.

J. H. Reddy, U. S. Atty., Chattanooga, Tenn., for respondent.

ROBERT L. TAYLOR, Chief Judge.

This review proceeding originated in the rejection by the Bureau of Old-

Age and Survivors Insurance in the Department of Health, Education and Welfare of the application of Elizabeth I. Vance for federal old age insurance benefits under the Social Security Act (42 U.S.C.A. § 401 et seq.). After the Director, upon reconsideration, determined that the original decision was correct, a hearing was had before a Hearing Examiner who on October 28, 1960 sustained the Bureau's determination. The Appeals Council denied review and thus constituted the determination of the Hearing Examiner as the final decision of the Secretary. Conley v. Ribicoff, 294 F.2d 190 (C.A.9).

Mrs. Vance, a farm owner, made her application as a person who had been gainfully self-employed. But the Bureau took the position and the Hearing Examiner decided that she was ineligible for benefits on the ground that she "did not materially participate in the production or management of the crops" during the years 1958 and 1959 and that, therefore, the income for those years upon which she had paid her self-employment tax (sometimes known as social security) pursuant to 26 U.S.C. § 1401(1) was not "self-employment income" as defined in Sec. 211(b) (Title 42 U.S.C.A. § 411(b)) of the Social Security Act.

The Hearing Examiner found that except for having the necessary quarters of coverage claimant had met all factors of entitlement for old age insurance benefits. Since she was born in 1878, she required only six quarters of coverage to be fully insured. If she were self-employed during the years 1958 and 1959, the self-employment tax she paid for those years would supply the necessary quarters of coverage. Her 1958 and 1959 Income Tax Returns which were submitted in evidence before the Hearing Examiner showed gross income of $597.-98 with expenses of $160.00 and a net farm profit of $437.98 upon which she paid a self-employment tax of $14.80 in 1958, and gross profits of $713.93 with expenses of $111.83 and a net profit of $602.10 upon which she paid a self-employment tax of $22.58 in 1959.

Mrs. Vance was a widow, eighty-two years old who lived alone on her 80 acre farm in Monroe County, Tennessee. During the years 1958 and 1959, she cultivated or rented as pasture land 52 acres of the farm. The cultivation was accomplished with the aid of a crop-share farmer neighbor by the name of Lester Akins.

"Net earnings from self-employment", insofar as they are derived from agricultural or horticultural commodities are defined in Sec. 211(a) (1) of the Act (42 U.S.C.A. § 411(a) (1)). This Section reads in part as follows:

"(1) There shall be excluded rentals from real estate and from personal property leased with the real estate (including such rentals paid in crop shares), together with the deductions attributable thereto, unless such rentals are received in the course of a trade or business as a real estate dealer; except that the preceding provisions of this paragraph shall not apply to any income derived by the owner * * * of land if (A) such income is derived under an arrangement, between the owner * * * and another individual, which provides that such other individual shall produce agricultural or horticultural commodities (including livestock, bees, poultry * * *) on such land, *and that there shall be material participation by the owner * * * in the production or the management of the production of such agricultural or horticultural commodities*, and (B) there is material participation by the owner * * * with respect to any such agricultural or horticultural commodity;" (Emphasis added)·

The sole question is whether, under the facts of her arrangement with Akins, there was "material participation" by her as owner "in the production or the management of the production of such agricultural or horticultural commodities."

The contract with Akins for the years 1958 and 1959 was subscribed before a notary on January 14, 1960 and

apparently was drawn to confirm the oral understanding by which the farm was operated in 1958 and 1959. The contract is copied in full:

### "CONTRACT—RENTAL OF FARM

"This contracted entered into for the year 1958 between Mrs. Lizzie Vance of the first part and Lester Akinn of Second Part:

"Akins is to cultivate this farm by raising the following crops Namely: Hay Oats corn and Tobacco. For the year 1959 14 acres of wheat, 10 acres of Oats, 14 Hay and .06 Tobacco.

"Party of the second part furnishes tools for preparing and cultivating the crop except the tobacco. Party of the First Part furnishes stock to tend the tobacco. Akins gets ⅔ of Wheat, ½ Hay and ⅔ Corn.

"Party of the First part furnishes ½ all[1] Fertilizer for the Tobacco all of Spray and plants, sticks and and barn room, participates in raising tobacco as much as possible and the agreement is that she advises where to Plant certain crops and where to Market the grain and Tobacco.

"Sign: /s/ Mrs. Lizzie Vance
        Mrs. Lizzie Vance, First Part
"Sign: /s/ Lester Akins
        Lester Akins, Second Part

"Subscribed and sworn to before me, this, January 14, 1960. My commission expires Jan. 23, 1962

(Notary Seal)

    "/s/ Annie L. Young
        "Notary Public."

Although noting that the contract was not executed until 1960, the Hearing Examiner did not take issue with its accuracy. In fact, since the hearing was had solely upon the testimony of Mrs. Vance and her daughter and upon documents submitted by Mrs. Vance such as the contract and her tax returns, and upon the formal documents of the Bureau, no facts are in dispute, only the inferences to be drawn therefrom.

Claimant's testimony with respect to her handling and management of the farm was as follows: Fifty-two of the eighty acres of the farm were in cultivation which included acreage in pasture. In 1958, in addition to items of income from her arrangement with Akins, she received $25.00 for calf pasture and $117.37 for the sale of two calves. She sold two quilts for $40.00 and sold some pears. From her operation with Akins she sold wheat worth $96.76, hay worth $85.00 and tobacco worth $284.85. Her expenses for that year were $160.00, including taxes, lime, fertilizer, baling hay and hired labor.

She testified that she lived alone on the farm, but that Mr. Akins tended the crops. She testified she furnished all the fertilizer and spray for the tobacco crop, including the mule and tools to plow it, the sticks and barn and room for everything. She told him where to plant the tobacco and if the crop needed plowing or anything she would call him. She admitted he was a good farmer. She did not hoe the crop but advised Mr. Akins when it was needed. They decided together when to cut the tobacco and when to sell it. The tobacco was close to her house and she would pass the tobacco every day or two and go out into it and inspect it. If she found worms in the tobacco, she would call Mr. Akins.

With respect to the wheat and hay, she testified that Akins got two-thirds of the wheat. This was the arrangement where she furnished part of the seed and fertilizer. Had she furnished all, she would have gotten one-half. Akins combined the wheat and put it in the barn. She sold it to the Madisonville Mill.

She testified that she got one-half the hay, paying one-half of the bale bill.

---

[1]. The word "all" was interlined by hand after the contract was typed. Mrs. Vance's testimony is clear it should have been "all" rather than "½".

For the corn, she furnished a third of the seed and fertilizer and Akins received two-thirds of the corn.

Questioned whether she did any work in connection with the wheat, hay or corn, she replied that she "didn't help bale it or nothing like that", but she told him where to put it.

Asked whether her agreement with Mr. Akins differed in 1958 and 1959 from that of 1957, she indicated that it did not except that the crops were rotated. The tobacco, however, was in the same place each year close to the house.

She testified that Mr. Akins was a good farmer having as many as seven acres of tobacco at one time. Her own allotment which he worked was six hundredths of an acre. The evidence showed that besides one or two farms of his own, he worked farms of other people including claimant's. He did not work her farm in 1960 because of the death of his wife and the marriage of his son, so that he couldn't handle it.

The claimant's daughter, Mrs. Arlie L. Baker, testified that her mother had a keen mind and was capable of operating the farms, that she ordered her supplies by telephone after figuring out her seed and fertilizer needs, that she writes her own checks, makes her own deposits, pays all the farm bills. She testified her mother called in the person who was running the farm and advised where she wanted certain things planted, about crop rotations and things of that nature. She testified that Mr. Akins worked the farm for three years and that there was a contract but that she didn't know just what it was, that her mother managed her own affairs without consulting her and that she was busy about the operation of the farm all the time. Mrs. Baker testified that her mother decided when the tobacco needed working, when it was in case and that she would call her tenant on the telephone and tell him to get busy. She decided where to market her tobacco. With respect to the other crops of wheat, hay and corn, she testified her mother did "nothing more than buying the seed and telling him when and where and how much fertilizer to use. I have heard her discuss that with him."

On this oral testimony, together with the documentary evidence and especially the contract between Mrs. Vance and Mr. Akins, the Hearing Examiner concluded:

"It appears from the entire record in this case that there was no arrangement whereby the claimant was to participate or render physical services in the production of the crop and there is no allegation or evidence of probative value that there was an agreement that the claimant would materially participate, nor on the basis of the claimant's activities will the record permit such an inference of such an agreement. The statement by the claimant and her daughter relative to her activities around the farm merely reflected the normal self-interest of the owner of the farm under rental sharecrop agreements and falls far short of material participation in the production or management of the production of the commidities (sic) raised. It is clear from the record that she had had a farm arrangement with her tenant for several years and her activities in connection with the crops did not materially affect the production or contribute to the success of the crops.

\* \* \* \* \* \*

"It is the finding of the hearing examiner that the claimant did not materially participate in the production or management of the crops for the years in question and that her income reported for 1958 and 1959 was derived from sharecrop operations and the claimant has no self-employment income for the years in question, acquired no quarters of coverage in those years, and was not a fully insured individual at the time she filed her application for benefits."

For emphasis, we repeat one sentence from the Examiner's report: "It is clear from the record that she had had a farm arrangement with her tenant for several years and her activities in connection with the crops did not materially affect the production or contribute to the success of the crops."

We have no such certainty.

In Henderson v. Flemming, 283 F.2d 882 (C.A. 5), we had a share-crop situation. It is true the claimant in that case operated through her son as agent but in the comment upon and analysis of the type of activity necessary for participation the case is pertinent. The Court quoted from the Appeals Council in summarizing the activities of the agent:

"* * * 'The evidence shows that he selected the land the sharecroppers were to work, that he decided when the land was to be planted, how much fertilizer was to be used, when the crops were to be cultivated, when the plants were to be sprayed, when the crops were to be harvested and when they were to be sold.'"

Then assimulating the activities of the agent to claimant, the Court said,

"Under the sharecropping arrangements effected in her behalf by Joe, Mrs. Poole, of course, furnished the land. But there was much more. She was required to bear a considerable financial risk and contribution. She furnished the planting seed and bore one-half the cost of insecticide which ran in the neighborhood of $1100 per year. She was required to 'break ground' and plant the crop * * *"

We perceive, of course, that Mrs. Poole's operation was a much larger one than was Mrs. Vance's. But each claim must be evaluated on its own facts and the size of the operation alone would not be determinative. Our problem is to determine the materiality of the participation of claimant in the production, or its management, of the agricultural commodities in the perspective of the total operation.

The Court in the Henderson case throws further light on the problem with the following comments,

"* * * But the variables of our complex rural economy, well known to Congress, presented other situations in which the owner of the land did much more than furnish the land (and for which he would receive his rental). He might, under the arrangement, determine the crops to be planted, the areas to be cultivated, the time of planting, the fertilization program, and the manner and time of harvesting. If these activities were of a material, i.e., substantial importance from a practical point of view, then the Amendment was to make such activities self-employment by the owner and the proceeds income from self-employment * * *"

And again,

"* * * One is hardly a mere landlord in the traditional sense if he must risk considerable funds in addition to the land in the success of the venture. And what he gets— or hopes to get—is more than rent. It is profit from the operation of a business, a business fraught with financial risks—the business of producing agricultural commodities."

In Harper v. Flemming, 288 F.2d 61 (C.A. 4), the farm of an aged claimant was managed by the trust department of a bank as her agent. It is not disputed that claimant assumed most of the costs of production except that of labor. She supplied the sharecroppers with one-half the fertilizers, seeds, plants, pesticides and fuel for curing tobacco, as well as providing all the tools, equipment, livestock, feed, machinery repairs and veterinarian's fees. The bank's representatives made eight inspections a month during growing season and marketed the crops, kept the accounts and advised with the sharecroppers in selecting the land for planting, and in deciding the proper time for cultivating and harvesting. The Court upheld the lower court's decision

that this constituted material participation.

In Conley v. Ribicoff, 294 F.2d 190, (C.A. 9), the Court of Appeals reversed the District Court and held that the claimant materially participated in the management. In that case, the farm of the claimant was cultivated by his neighbors. He went to California but he returned for two weeks in the fall and again in the spring. He made the farm plan for the ensuing season and determined the crop to be planted and the place. The Court recognized that he had long experience with that particular land and was qualified to select the kind of seed and its quality and quantity.

We readily note that the operations in the Henderson, Harper and Conley cases were larger than that of Mrs. Vance. We note also that the participation of each either directly or through agents was probably greater than that of Mrs. Vance. But the act does not set any standard for such participation percentagewise, it simply states that the participation must be "material".

In Foster v. Flemming, 190 F.Supp. 908 (Iowa), the District Court sustained the finding of the referee that there was no material participation by the owner. In that case, the tenant agreed to furnish all necessary tools, machinery, equipment, livestock, crop seeds and labor to operate and maintain the farm in a husbandlike manner and to put in such crops and in such manner as the landlord may direct. There then followed twenty-three specific undertakings by the tenant prescribing in minute detail his activities as to waste, clean-up, etc. But the Court pointed out that though Mrs. Foster directed the crops and manner of planting, she made no contribution to the lease except the furnishing of grass, clover and alfalfa seed.

In the Gregersan case, No. 4–58 and 378, U.S.D.C. Minnesota, as reported in the Foster case, the claimant who lived in Minnesota had a farm in Montana. She decided the type and quantity of seed each spring, purchased the seed and in the fall returned, and made the determination as to harvesting. She paid half the combining cost and haulage costs. The tenant furnished all machinery and labor. The Court held there was not the required participation.

The range of factors entering into the decision of these cases makes our task a difficult one here. But we are quite sure that the magnitude of the operation is not the governing factor. The court, in the Foster case, held there was no arrangement or, put in another way, there was no material participation and the furnishing of certain seed and the settling of a crop plan was not enough for participation.

In our case, a close reading of the income tax returns, contract and testimony reveals that the tobacco crop produced over 40 per cent of the income from the crop-share activity in 1959 and about 60 per cent in 1958. As to the tobacco, claimant supplied all the plants, all the fertilizer, all the spray and sticks and the barn for drying it. The record is not clear whether she sowed the seed and prepared the tobacco bed in supplying the plants, or whether she arranged for the purchase of the plants. In either event, her contribution in work or management was substantial. She furnished all the fertilizer and spray. She also provided the mule and apparently the plow, for the cultivation. The burden of preparation of a tobacco bed in production of the plants and the amount of fertilizer required and used is graphically described at page 8 of the Government's brief. Although it is not evidence, the Court accepts the statement as a fair portrayal of the work involved in raising tobacco.

In the light of the Henderson case, we are impressed that Mrs. Vance's participation in the operation was material by reason of her contribution to the tobacco crop alone. As to the other crops, she furnished half the seed and fertilizer as to the hay, and one-third as to the wheat and corn. These items of expense were approximatley one-third of the gross from the crop-share operation in 1958, although only 10 to 15 per cent of the

gross in 1959. Regardless, in both years she made a substantial investment in the operation, and this was given weight in the Henderson case.

In thus reaching the conclusion that claimant here did materially participate in the production of the commodities and is hence entitled to old age insurance benefits, the Court is not unmoved by the following statement of the Court in Harper v. Flemming, supra, 288 F.2d at page 64:

"The utilization of capital in the form of land or other property, in the production of earnings, does not exclude other self-employed persons from paying the tax and enjoying the benefits of the Act. Even the self-employed of very modest means often engage capital in this way. If farm owners are to be assimilated to these other groups, we perceive no basis in reason or in the text of the statute which would exclude them under the same circumstances.

"Moreover, other self-employed persons are not deprived of coverage because of the possibility that their businesses may continue to be conducted by agents without loss of income after the insured has attained an advanced age. Farm owners should likewise not lose coverage for this reason, although the benefits may, under other provisions of the Act, be affected by the amount of income these persons may continue to earn.

"In summary, the legislation, considered in its entirety, reveals a progressive broadening of the old age and survivors' insurance plan to cover not only those originally embraced, namely employees who work for others, but also self-employed professional and businessmen, and later farm operators, and still later specifically farm owners. The purpose, as reported by the Congressional Committees, is clearly to make the coverage of the program 'as nearly universal as practicable,' and 'to give the newly covered groups equitable treatment as compared with those brought in earlier.' The legislation had its origin in the observed frequency of the tragic sequence of old age, disability, loss of earning power, destitution and dependency on public or private charity, but coverage has not been limited to cases actually presenting all these features in full scope. The concept of the statute is more inclusive, and the design is, by a comprehensive contributory insurance plan, to avert the personal hazards and the social problems which often, but happily not always, attend old age."

Finally, although not determinative of the case, we are constrained to observe that it is shoddy business for one branch of the federal government to retain taxes paid on the premises that the taxpayer *was* self-employed, while another denies social security benefits on the premise that taxpayer *was not* self-employed.