Beulah BRYANT, Plaintiff,

v.

Anthony J. CELEBREZZE, Secretary of Health, Education, and Welfare, United States of America, Defendant.

Civ. A. No. 7733.

United States District Court
E. D. South Carolina,
Florence Division.

April 29, 1964.

**330**

Gasque, Seals & Gasque, Latta, S. C., for plaintiff.

Terrell L. Glenn, U. S. Atty., Columbia, S. C., and Thomas P. Simpson, Asst. U. S. Atty., Charleston, S. C., for defendant.

DALTON, District Judge.

This is an action which presents the issue of the plaintiff's coverage under the Social Security Act, as amended. 42 U.S.C.A. § 401 et seq. (hereinafter called the Act). The dispute comes before this Court pursuant to § 205(g) of the Act (42 U.S.C.A. § 405(g)), whereby the plaintiff, after exhausting her administrative remedies, seeks a judicial review of the "final decision" of the Secretary of Health, Education and Welfare rejecting her application for federal old age benefits under § 202(a) of the Act (42 U.S.C.A. § 402(a)). The plaintiff, Beulah Bryant, contends that she became entitled to old age benefits by reason of having reported and paid self-employment taxes on income (in the years 1956 through 1960) derived from farming operations conducted through sharecropping arrangements on her land, in which operations it is contended she was a material participant as required by § 211(a) of the Act. (42 U.S.C.A. § 411(a)).

The Bureau of Old Age and Survivor's Insurance of the Social Security Administration (hereinafter called the Bureau) has taken the position that plaintiff did not materially participate in the farming operations on her land and thus has refused to allow the income therefrom to be credited toward her required quarters of coverage. The Bureau determined that plaintiff must have twelve quarters to be fully insured, or that she have quarters of coverage in all but four calendar quarters after 1954 and before July 1, 1957, or before the quarter in which she reached retirement age, if it is later. It is noted that under a 1961 amendment the requirements for insured status were liberalized and that plaintiff must now have only six quarters of coverage for a fully insured status. 42 U.S.C.A. § 414. However, disallowing credit for the income derived from the sharecropping rentals, the Bureau determined that plaintiff had no quarters of coverage and returned to her the amounts which she had paid into the fund, such checks still being in the possession of the plaintiff.

The findings of the Bureau were confirmed by a hearing examiner and in turn by the Appeals Council of the Social Security Administration. This Court, after reviewing the entire record, finds that Beulah Bryant did not materially participate in the farming operations on her land in the years 1956 through 1960, and, therefore, finds that she is not entitled to the benefits sought.

Miss Beulah Bryant was born February 4, 1895. She has lived on farms in Marion County, South Carolina, with her parents throughout her life. She cared for her elderly mother until the latter's death in 1957 and was at the time of the administrative proceedings caring for her father who in 1961 was 89 years of age.

The record in this case indicates that in times past plaintiff's father, D. C. Bryant, had been a farmer with his principal crops being tobacco and cotton. All the children of the family, including Beulah, had taken part in laboring on the farm. As the parents grew older, the family lands had been divided among the children. Prior to the events material here, Beulah had been granted a deed by her mother to the family home and the surrounding twenty acres of farm land. In 1956 Beulah received an additional tract of land from her father which consisted of twenty-nine and one-half acres not adjoining the original grant. Herbert Bryant, the plaintiff's brother, owns and farms the tract of land which adjoins her original twenty acres.

The plaintiff applied for old age benefits on April 5, 1960. She reported in her application, among other things, that she had never filed an application for Social Security benefits before; that she did have a disability which had begun six months before she reached age 65 and which had made her unable to do any substantial work; that in the years 1958 and 1959 she had earned more than four hundred dollars per year as a farmer; and that she had no earnings thus far in 1960 but that she was self-employed and expected her earnings to be "about $1600" for the year.

In conjunction with the application, she also filed a "FARM SELF-EMPLOY-MENT QUESTIONNAIRE" dated April 5, 1960, which related to the period January 1, 1955, to December 31, 1959. Plaintiff stated, therein, that she lived on her farm, and that she was the head of the farming operation on it. In response to a question regarding other persons who took part in operating the farm, she reported that a Negro man, Marion Brady, had sharecropped the farm in 1955 but thereafter, in the years 1956 through 1959, her brother, Herbert Bryant, had sharecropped the farm with her. She said that Herbert had "worked the crop and looked after it like he would his own." She reported that the farming operations consisted of 4 acres of cotton,

3.26 acres of tobacco and about 15 acres of grain.

In additional support of her application, both plaintiff and her brother filed explanations of their sharecropping arrangements on official forms entitled "FARM ARRANGEMENT QUESTION-NAIRE." Here, it was reported that Herbert had agreed to sharecrop the farm because he knew that they would not be able to get such a small acreage farmed properly otherwise. She said she agreed to the arrangement because she knew "the place would be worked as it should be."

The working arrangement between the parties, according to the statements, was entered separately for each crop year from 1956 through 1959, and the same agreement was to be employed in 1960. It had never been reduced to writing but, according to Beulah, she was to furnish all the land and the fertilizer. She was also to provide crop insurance and insurance on the buildings and she was to pay all the property taxes. Herbert was to furnish all the labor, equipment and machinery, and all the necessary insecticides in connection with growing the crops. Each agreed to pay one-half of any additional expenses. They shared in the proceeds of the operation on an equal basis. Apparently, at the times when the terms of the yearly agreements were discussed, the parties did not contemplate the particular problem of whether plaintiff would exercise any supervisory control over the production of the crops. She did state that she did no physical work nor did she visit the government office for the purpose of securing crop allotments.

Question No. 3 of the form was as follows:

"Advice and Consultation. (Describe what was talked about or considered, how often meetings were held, what advice was given and by whom and what actions were taken as a result of the advice given or the discussions which were held?."

To this question plaintiff replied:

"It was about the same each year. I did not do much about consulting

with Herbert. I trusted him and knew he would do what was best to do. We talked from time to time about how the crop was growing. He never came to me for advice about what to do in the crops. He knew best what to do about it more than I did. If anything was needed he did it." (Tr-130)

In response to the same question Herbert answered:

"Whenever we would meet up—sometimes once or twice a week—sometimes two weeks we would discuss different things to do—for instance she told me to buy fertilizer like I bought and use it just like I used it on my crop. That was first year I sharecropped for her. After that I did hers the same as mine. When we talked I told her about the progress of crops but she always told me to do what I thought best to do. I am one of the best farmers in that part of the country." (Tr-134)

Question No. 4 was as follows:

"Inspections. (Describe what, if any, inspections were made by the person whose status is under consideration. Include what was inspected, how often inspections were made, the purpose of the inspections and changes resulting from inspections.)

Plaintiff replied:

"The cotton was near the house and I could see that but the tobacco was farther off from the house and I did not go out into the field at any time except one time in 1959 I went to see how tobacco was looking. If I'd felt good I would have gone out more but it did not feel good enough to go into the fields. When I did go out it was just to get out the house."

In describing what management decisions were made by each party, plaintiff stated:

"Lots of times I asked Herbert what tobacco seed he planned to use on his place. He would tell me what he thought was best and what he was using on his place and I agreed to it for my place. * * * I let him plant at time he seen fit. Sometimes he might say 'I think I'll plant so and so at such and such a time' but usually he would go ahead as he would his own. Sometimes he would come up to me and tell me what was being done but it would be all right if he didn't. He knew I was not able to superintend it. * * * He might tell me he was going to do certain things but he did not ask my advice. * * * I kept tax receipts, insurance records. * * * Herbert hired any labor needed. He paid and supervised them. He did not consult me when any hired labor was needed." (Tr-131-132)

In discussing the financial operations of their arrangement, she said she did not make regular advancements to Herbert but that on one occasion she had let him have "a few hundred dollars because he ran short." She related how Herbert brought the sales receipts to her each time he sold tobacco and she kept them. Then they divided the proceeds.

The answers supplied by Herbert on the questionnaire were substantially in accord with and served only to supplement those of the plaintiff. He stated that the plaintiff came out to the fields two or three times a year to look over her crops and that she always found them in good condition. For that reason, she never gave him any instructions as a result of her inspections. He said that they discussed where to put the tobacco beds and cotton but there was always agreement. He said that if any changes were to be made he would suggest them to Beulah. She would agree.

After the plaintiff's application was denied on the basis of the foregoing evidence, she requested a hearing which was granted. Her relationship to the operation of the farm as derived from the testimony at the hearing varies to a substantial degree from the relationship as it appeared from the evidence above. At the hearing the plaintiff testified that

Herbert began sharecropping her land in 1958. Prior to that time she said Marion Brady had worked the land under an agreement whereby she was to furnish all the land, fertilizer, seed and tobacco twine and he was to work the land and raise the crop. He had his own horse and plow which were to be used for this purpose. She was to furnish him with money, the amount being "about thirty five dollars a month", according to her testimony. In addition, she occasionally paid his light bill. She made these periodic advances to Brady, and when they began selling the crop, he was required to repay the amount of the monthly advances after which they shared equally in the receipts. She stated that this arrangement continued through 1957 at which time Marion moved off her place. She also said that prior to 1958 she had one acre of tobacco which she worked herself with occasional help from Marion. She said that until 1958 the only work that Herbert did on her farm was to periodically bring his tractor there for disking and other operations difficult to perform without mechanized equipment. In return therefor, Marion helped with the farming on Herbert's land at times.

The material difference between the testimony at the hearing, offered by Herbert and Beulah, and the statements offered by them at the time the application was filed, was with regard to her participation in the management of the crop. At the hearing she stated:

"* * * We discussed it, the farm situation and I asked him, you know, about—told him about what I would like for him to do about the planting and every thing." (Tr–59)

In testifying as to the nature of the agreement with her brother, she said:

"* * * Just that he, he would work it according to the way I wanted him to work in it, and how I wanted it worked." (Tr–60)

With regard to her participation in the production of her crops during the years 1958 and 1959, the hearing examiner propounded questions and the plaintiff testified as follows:

"Q. Well now did I understand you correctly a while ago to say that you did get out and look at the crops and go about?

"A. I certainly did.

"Q. Until 1958? But in 1958 you became too disabled?

"A. I looked after my crop though I was disabled. I went. I probably didn't go out in it every day but it's not necessary to go into a little crop, small crop that I have, every day because when you go into it one day you see what is—and it's not going to change that much in one day to the next. But I do participate in my crop.

"Q. Did you go out in your crops in '58 and '59?

"A. Yeah.

"Q. You went out into the fields?

"A. Yes, I went into my fields." (Tr 63–64)

The hearing examiner was of the opinion that the statements tendered by the plaintiff and her brother on April 5, 1960, reflected more accurately the nature of the farming operations conducted on plaintiff's farm. On this basis he found that the plaintiff's earnings from the one acre of tobacco which she allegedly farmed alone in 1956 and 1957 had not been established, and that the plaintiff did not materially participate in the sharecropping arrangements in any of the years 1956 through 1960. Thus, the income from the sharecropping arrangements was not "self-employment income".

Upon denial of her claim by the hearing examiner, plaintiff sought a review by the Appeals Council. The appeal was granted and additional evidence was gathered. This evidence, among other things, included statements by Marion Brady in which he reported that he had sharecropped for the plaintiff's father until 1956 and that he had sharecropped for the plaintiff in 1957 *and in 1958*. The hearing examiner did not make a specific finding of fact as to when the arrange-

ment between Herbert and Beulah was first operative even though there was a serious conflict in the evidence on this point. The statements offered by the plaintiff and her brother on April 5, 1960, were to the effect that the arrangement was instituted in 1956 and that the last year in which Marion Brady sharecropped the farm was 1955. The testimony at the hearing indicated that Brady sharecropped the farm until after 1957. The opinion of the examiner with regard to the relative merits of the evidence obtained from the statements and from the hearings as it reflected on the nature of the operation of plaintiff's farm is not conclusive on this point.

The Appeals Council noted that the ASC records listed plaintiff's father as the farm operator through the year 1958 with Marion Brady named as the producer. For subsequent years Beulah Bryant was shown as the farm operator with Herbert Bryant listed as producer. Nevertheless, the Appeals Council reviewed all these conflicting claims and concluded that Herbert Bryant and Beulah Bryant instituted their sharecropping arrangement in 1956 and that it continued in operation through the year 1959. There is substantial evidence to support this finding. The Appeals Council, upon a consideration of all the evidence, affirmed the decision of the hearing examiner, thus becoming the "final decision" of the Secretary, which the Court is now called upon to review.

Section 211(a) of the Act provides:

"The term 'net earnings from self-employment' means the gross income, as computed under chapter 1 of Title 26, derived by an individual from any trade or business carried on by such individual, less the deductions allowed under such chapter which are attributable to such trade or business, * * *

"(1) There shall be excluded rentals from real estate * * * (including such rentals paid in crop shares), together with the deductions attributable thereto * * *; except that the preceding provisions

of this paragraph shall not apply to any income derived by the owner or tenant of land if (A) *such income is derived under an arrangement,* between the owner or tenant and another individual, *which provides* that such other individual shall produce agricultural or horticultural commodities * * * on such land, and *that there shall be material participation by the owner* or tenant in the production or the management of the production of such agricultural or horticultural commodities, *and (B) there is material participation by the owner* or tenant with respect to any such agricultural * * * commodity;" (Emphasis supplied) 42 U.S.C. A. § 411(a).

The nature and scope of the judicial review in this case is limited by § 205(g) of the Act:

"* * * The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing. The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive * * *." 42 U.S.C.A. § 405 (g).

█ It is urged on behalf of the Secretary that the only issue before this Court is whether there is substantial evidence to support the final administrative decision. But clearly, the administrative decision is conclusive only when it is evident that this decision is the product resulting from an application of the correct legal standards. Thus, the Court is confronted with a fully reviewable question of law. Conley v. Ribicoff, 294 F.2d 190 (9th Cir. 1961); Boyd v. Folsom, 257 F.2d 778 (3rd Cir. 1958).

█ The report of the Senate Finance Committee regarding the 1956 amendment to the Act tells us that their policy is for the coverage extended under the Act to be as nearly universal as is practicable. Sen. Rep. No. 2133, 84th

Cong. 2d Sess., 1956, 3 U.S.Code Cong. & Adm. News 1956, p. 3878. However, there is promulgated an affirmative standard in order for a landowner to derive self-employment income from a share farming operation. The requirements of the standard are twofold: (1) There must be an arrangement providing for material participation by the owner, and (2) there must in fact be actual material participation. The arrangement provision in the statute means that the landlord must be authorized to materially participate in the operation and that in the absence of arrangement therefor, voluntary services or inspections performed by the landlord will not satisfy the statutory requirements. Foster v. Celebrezze, 313 F.2d 604 (8th Cir. 1963). In the instant case the plaintiff did not specifically retain any authority or right of supervision over the operation. Nor did the arrangement specify any participation by the plaintiff except with regard to her financial contributions. This Court is of the opinion, however, that had there been actual participation by the plaintiff, her authority to so participate could be implied from the circumstances surrounding the sharecropping arrangement. She did reside on the farm and remained in actual possession of the land in the years during which the sharecropping operation was being conducted. Also, it would seem that due to the family relationship of the parties, if Beulah had possessed the skills required for farm management her brother would have paid heed to her suggestions and would have acquiesced in her taking part in the control of the farming operations on her land. It is noted, however, that Beulah apparently did not possess the requisite skills for farm management. Even during the time that the Negro sharecropper was working her land it seems that Herbert made most of the decisions regarding the activities on her farm. In the farm arrangement questionnaire filed by Brady, he stated:

"If I wanted to know something about the crop I would ask Beulah first and if she didn't know I would ask Herbert.

"She didn't know anything about crops and I usually had to talk to Herbert about them.

"Herbert told me when to cut the tobacco. She did tell me one time that I was cutting too much off but Herbert told me to go ahead and cut it."

In any event, the plaintiff must have, in fact, participated in the operations as required by the Act, and in this respect she fails to meet the statutory standard. No doubt exists with regard to her physical labor in connection with the farming. Both in his statement prior to the hearing and in his testimony at the hearing, her brother acknowledged that Beulah did not perform physical labor on the farm. (Tr–99–100, 133). Thus, if she did participate in the arrangement, it must have been in a managerial or supervisory capacity. The owner need not personally settle all the important problems that arise in conducting the arrangement for Congress employed the term "participation" denoting joint activity. Conley v. Ribicoff, 294 F.2d 190 (9th Cir. 1961). Thus, in the Conley case the landowner was allowed to credit his farm sharecrop earnings as self-employment income even though he only visited the farm twice each year. The visits sometimes extended over a period of two weeks at which time he made the farm plan for the ensuing season and designated the crops to be raised and the particular field in which they would be located. This, together with other decisions regarding the farm program, was held to constitute material participation.

In Vance v. Ribicoff, 202 F.Supp. 790 (E.D.Tenn.1961), an elderly lady was held to have materially participated in her farming operation primarily on the strength of her financial responsibility in the sharecropping arrangement. However, it is readily apparent that she personally played a substantial part in the farming. She told the sharecropper where to plant tobacco, advised him when

it needed attention, and periodically inspected the crop for worms. The Court is impressed with the lack of any such evidence in the instant case. Not a single instance has been shown where the plaintiff made an important decision with regard to the farming operation or where her presence was of a significant value to a decision made by Herbert. The Court accepts the testimony of plaintiff that she periodically discussed the management of her farm with the sharecropper but determinative of the issue is the fact that her conclusion was always to the effect that he would work her farm just as he did his own.

The Appeals Council stated that there was no allegation of, nor did the evidence establish the existence of, an employer-employee or agency relationship between the plaintiff and her brother. Thus, the council considered the rules laid down in Harper v. Flemming, 288 F.2d 61 (4th Cir. 1961) and Henderson v. Flemming, 283 F.2d 882 (5th Cir. 1960), but held that they did not apply here. In the Henderson case a 91 year old mother was credited with self-employment income and thereby eligible for benefits based on her material participation in crop production on her land. Her son performed all the managerial functions, but his efforts inured to her benefit via an agency relationship between them. In Harper v. Flemming, supra, the claimant, also an elderly lady, was held to have received self-employment income from a sharecropping arrangement in which a banking institution, acting as her agent, performed the managerial functions of the operation. In both cases the rationale followed was that self-employed persons other than farm owners are permitted credit on earnings derived from a trade or business conducted through agents, and Congress in amending the Act sought to bring the coverage extended farm owners into equity with that accorded other self-employed persons. It would seem, if there were sufficient earnings to give plaintiff the requisite quarters of coverage from the sharecropping operations conducted while Brady was working her land, that the plaintiff could establish her claim based on the rationale of the Henderson and Harper cases. The managerial functions performed by Herbert Bryant as her agent would inure to her benefit and this, together with her actual financial participation, would demonstrate material participation in the manner required by the Act. However, the Secretary found, on competent evidence, that Brady terminated his relationship after 1955, thus, there were no qualifying earnings on which the claim could be established. Even if the Court were to find that Brady sharecropped the farm until 1957 in accord with plaintiff's testimony at the hearing, the result would not be different because no earnings were established for the year 1956. In that year plaintiff had gross earnings from the sale of tobacco in the amount of $556.37. (Tr–142–146). She failed to file a return in 1956. Later, she did file a return for the year, but in so doing she deducted only $100.00 expenses from the gross self-employment income of $556.37. She failed to deduct expenses incurred in 1956 for seed and fertilizer (approximately $342.00), and for fuel oil ($121.58). (Tr–74–76). Furthermore, she did not report any deductions for taxes or depreciation on the barns located on her farm while such deductions were taken in each year thereafter. (Tr–82, 144–145, 149–150, 154–155, 159–160). It was correctly determined by the Secretary that plaintiff had not established the required $400.00 income from self-employment in 1956 in order to be credited with any quarters of coverage for the year. 42 U.S.C.A. § 413.

The net of this is that if plaintiff is entitled to benefits, the right thereto must arise out of her material participation in the sharecropping arrangements with Herbert Bryant after Brady's departure. It is true that these arrangements required her to assume a substantial portion of the financial responsibility for the farming operations. The court, in Henderson v. Flemming, supra, intimated that material participation might be oc-

casioned through financial contributions alone, without the necessity for any physical or supervisory activity:

"An owner of land who is required to (and does) furnish substantial amounts of cash, credit or supplies toward this mutual undertaking which are reasonably needed in the production of the agricultural commodity and from the success of which he must look for actual recoupment likewise makes a 'material participation.' One is hardly a mere landlord in the traditional sense if he must risk considerable funds in addition to the land in the success of the venture. And what he gets—or hopes to get—is more than rent. It is profit from the operation of a business, a business fraught with financial risks—the business of producing agricultural commodities." Henderson v. Flemming, 283 F.2d 882, 888 (5th Cir. 1960).

The Senate Finance Committee, in reporting the 1956 amendment to the Act, said:

"Under this amendment it is contemplated that the owner * * * must participate to a material degree in the management decisions or physical work relating to such production * * *. The committee is of the opinion that in any case in which the owner or tenant establishes the fact that he periodically advises or consults with such other individual as to the production of the commodities and also establishes the fact that he periodically inspects the production activities on the land he will have presented strong evidence of the existence of the degree of participation contemplated by the amendment. If the owner or tenant also establishes the fact that * * * he furnishes, or advances, or assumes financial responsibility for, a substantial part of the expense (other than labor expense) involved in the production of the commodities, the committee feels that he will have established the existence of the degree of participation contemplated by the amendment." Sen.Rep.No.2133, 84th Cong. 2d Sess., 1956, 3 U.S.Code Cong. & Adm.News 1956, p. 3915.

The court in Henderson read the above to mean that the committee intended financial contribution to offer another independent means of materially participating. 283 F.2d 882 n. 9 (5th Cir. 1960). But the language indicates that the committee intended that participation in management decisions standing alone could satisfy the requirements of the Act if the amount of consultation and inspection is substantial. Also, the requirements of the Act may be met if there is some degree of managerial participation and in addition, a financial contribution to the operation.

The plaintiff contends that her delegation of authority was in direct proportion to the sharecropper's intelligence and dependability. However, the experience and skill of the sharecropper is not decisive and a consideration thereof can only lead to a misapplication of the statutory standard. Celebrezze v. Benson, 314 F.2d 219 (8th Cir. 1963). There is also a point raised concerning the accuracy of the transcription of plaintiff's testimony at the hearing but the Court finds no basis upon which to reach a conclusion other than that the record in this case is completely regular.

There is no substitute for the requirement that a claimant must either physically undertake a part of the farming activity or retain and exercise a substantial degree of managerial prerogative over it. Beulah Bryant has failed to demonstrate the existence of any of these facts in the sharecropping arrangements conducted on her land.

The decision of the Secretary is, therefore, affirmed.

An order will be entered accordingly.